**UNITED STATES of America**

v.

**Joseph D. HENSON, Appellant.**

**UNITED STATES of America**

v.

**Joseph E. MARSHALL, Appellant.**

**UNITED STATES of America**

v.

**Larry L. BROWN, Appellant.**

**UNITED STATES of America**

v.

**Ells W. JEFFRIES, Appellant.**

**Nos. 71–1456, 71–1491, 71–1497 and 71–1356.\***

United States Court of Appeals, District of Columbia Circuit.

Argued En banc June 1, 1972.

71–1356 argued June 8, 1972–before Panel.

Decided Oct. 17, 1973.

\* This case, which was considered *en banc* without oral argument, had previously been argued before a panel of the court.

Fred Warren Bennett, Washington, D. C. (appointed by this court), for appellant in No. 71–1456.

Robert M. Hausman, Washington, D. C. (appointed by this court), for appellant in No. 71–1491.

Jon P. Axelrod, Washington, D. C. (appointed by this court), for appellant in No. 71–1497.

Donald P. Zeifang, Washington, D. C. (appointed by this court), was on the brief for appellant in No. 71–1356.

Paul L. Friedman, Asst. U. S. Atty., for appellee in Nos. 71–1456 and 71–1497.

Richard L. Cys, Asst. U. S. Atty., for appellee in No. 71–1491.

Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, John G. Gill, Jr., and Leonard W. Belter, Asst. U. S. Attys., were on the brief for appellee in No. 71–1356.

Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, Herbert B. Hoffman, Percy H. Russell, Jr., John F. Evans and Kenneth Michael Robinson, Asst. U. S. Attys., were on the briefs for appellees in Nos. 71–1456, 71–1491, 71–1497.

Harold H. Titus, Jr., U. S. Atty., Earl J. Silbert and Leonard W. Belter, Asst. U. S. Attys., also entered appearances for appellees.

*On Rehearing En Banc*

Before BAZELON, Chief Judge, WILBUR K. MILLER**, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB, and WILKEY, Circuit Judges, sitting *en banc*.

McGOWAN, Circuit Judge:

These four criminal appeals were considered by the court *en banc* for the purpose of considering an important issue common to each. That issue is whether the statute recently enacted by the Congress, 14 D.C.Code § 305 (Supp. IV, 1971), which mandated the admission into evidence of certain prior convictions of each appellant were he to testify in his own behalf,[1] violated appellants' constitutional rights.

---

** Senior Circuit Judge Wilbur K. Miller, who was a member of the *en banc* court only in No. 71–1491 pursuant to Title 28, U.S.Code Section 46(c), did not participate in the decision of that case.

1. The statute, part of the District of Columbia Court Reform and Criminal Procedure Act of 1970, provides in relevant part:

> (a) No person is incompetent to testify, in either civil or criminal proceedings, by

We find that the statute, the effective date of which was subsequent to the commission of the offenses for which appellants were tried,[2] was, in its retrospective application to the cases before us, an "ex post facto Law" within the prohibition contained in Article I, Section 9, Clause 3 of the Constitution. We remand each case to the District Court for a determination whether, under pre-existing law, the prior convictions were properly admitted. In any case where the trial judge finds that the prior conviction evidence should have been excluded, and that the error was not harmless, we order a new trial.

## I

*No. 71–1356.*

Appellant Jeffries was tried and convicted by a jury of carrying a pistol without a license. 22 D.C.Code § 3204 (1967). The Government's case consisted of the testimony of the two arresting officers, the pistol, and a certificate that appellant did not have the required license.

Officer Beard testified that appellant's car was pulled over late in the evening of July 28, 1970, because it had a missing tail light and paper license plates that appeared to have been altered. He approached the car from the passenger's side and, upon shining his flashlight into the car's interior, observed the butt of a gun, later discovered to be loaded, protruding from a paper bag on the passenger's side of the transmission hump and within reach of the driver, who, Beard said, was alone in the car. Officer Busker, who approached the car from the driver's side, testified that he also saw no one other than the driver in the vehicle, and that he first saw the pistol when Beard directed his attention to it, after which he arrested appellant. He stated that after arrest appellant repeatedly attempted to return to his own car, whereupon he was subdued and handcuffed.

The defense consisted solely of appellant's own testimony. Contrary to the police testimony, appellant stated that he had as a passenger a friend, one Joe Covington, who left the vehicle just as it was being approached by the two officers. He asserted that, when he asked the officers if he could go after Covington, they refused and said he was resist-

reason of his having been convicted of a criminal offense.

(b)(1) Except as provided in paragraph (2), for the purpose of attacking the credibility of a witness, *evidence that the witness has been convicted of a criminal offense shall be admitted if offered*, either upon the cross-examination of the witness or by evidence aliunde, but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (B) involved dishonesty or false statement (regardless of punishment). A party establishing conviction by means of cross-examination shall not be bound by the witness' answers as to matters relating to the conviction.

(2)(A) Evidence of a conviction of a witness is inadmissible under this section if—

(i) the conviction has been the subject of a pardon, annulment, or other equivalent procedure granted or issued on the basis of innocence, or

(ii) the conviction has been the subject of a certificate of rehabilitation or its

equivalent and such witness has not been convicted of a subsequent criminal offense.

(B) In addition, no evidence of any conviction of a witness is admissible under this section if a period of more than ten years has elapsed since the later of (i) the date of the release of the witness from confinement imposed for his most recent conviction of any criminal offense, or (ii) the expiration of the period of his parole, probation, or sentence granted or imposed with respect to his most recent conviction of any criminal offense.

\* \* \* \* \*

(d) *The pendency of an appeal from a conviction does not render evidence of that conviction inadmissible* under this section. Evidence of the pendency of such an appeal is admissible. [Emphasis added]

2. Section 199(c) of the Act, *supra* note 1, Pub.L. 91–358 (July 29, 1970), provided that the effective date of the statute was February 1, 1971. The offense in No. 71–1356 occurred on July 28, 1970; those in No. 71–1456 on August 15, 1970; those in No. 71–1491 on June 21, 1969; and that in No. 71–1497 on April 22, 1970.

ing arrest. He denied seeing the pistol in his car on the evening of his arrest until Officer Beard recovered it from under the passenger's seat. Defense counsel stated he did not intend to call Covington as a witness. The Government expressed a desire to call him as a rebuttal witness, but decided to proceed without doing so upon discovering his transfer from the nearby jail to a narcotics treatment center.

■ At a pre-trial hearing on appellant's motion to suppress the pistol,[3] the Government announced its intention to impeach appellant with his 1968 robbery conviction should he elect to testify. Defense counsel represented to the court that, 14 D.C.Code § 305 notwithstanding, it should exercise its pre-existing discretion not to permit the impeachment, and that the statute if applied was an ex post facto law. The court stated the new statute made admission of the prior conviction mandatory. At trial defense counsel elicited from appellant on direct examination the fact of his prior conviction; the Government asked the jury to consider this conviction in ascertaining the veracity of appellant's testimony;[4] and the trial court instructed the jury that the conviction evidence was admissible solely for consideration in evaluating appellant's credibility and not his guilt of the offense charged.

*No. 71-1456.*

Appellant Henson was tried and convicted by a jury for violating the federal narcotics laws. 26 U.S.C. § 4704(a) and 21 U.S.C. § 174. The Government's case consisted solely of physical and documentary evidence and testimony of the two female arresting officers, who on the day of apprehension were working in casual clothes in Officer Taylor's private car.

Officer Taylor testified that on the afternoon of August 15, 1970, she and Officer Byrd observed appellant from her car in a doorway ten to fifteen feet away. During their fifteen or twenty minutes of observation, she noted four or five transactions between other persons and appellant, involving the giving of money to appellant, and the provision by appellant of manila envelopes or something from a yellow pouch in exchange. One of two men engaged in one such transaction, who had seen the officers the day before, said "Mod Squad," whereupon appellant looked at the officers and proceeded to a nearby drug store.

Taylor testified that they followed appellant, and that after he entered the

---

3. At the same hearing, defense counsel elicited from Officer Beard that there was no attempt to obtain fingerprints from the pistol, whereupon the trial court ruled the testimony inadmissible. Appellant here complains that this exclusion was error in that he could not argue to the jury that the Government's failure denied him possible corroboration of his testimony had Covington's prints been found on the weapon. He further argues the Government's failure to conduct a fingerprint analysis denied him due process by keeping from him evidence material to his guilt. These claims are without merit. Appellant never sought to introduce the fingerprint matter at trial, and its relevance seems questionable in any event. Nor did appellant ever seek to have the Government perform a fingerprint analysis, or attempt to obtain such analysis himself.

4. Appellant's final claims, aside from his constitutional challenge to the application of the impeachment statute, relate to comments of the Government during its summation. One is that the reference in the Government's rebuttal argument to the lack of corroboration of appellant's testimony concerning passenger Covington constituted improper comment on a missing witness. The trial judge overruled the objection, and we think properly so. The remarks did not directly, or in a meaningful indirect manner, ask the jury to draw an impermissible inference from Covington's absence. *Compare* Bradley v. United States, 136 U.S.App.D.C. 339, 420 F.2d 181, 185 (1969). And to the extent the existence of Covington was challenged, it was clearly in the context of his existence as appellant's passenger on the evening of the arrest. Finally, the Government's suggestion of corroboration of the nature of the gun placement within appellant's reach was supported at least by Officer Busker's discovery of the bag, and would not in any event amount to reversible error.

store she observed appellant throw the yellow pouch and some money on the floor and move away. Taylor then recovered the money and pouch, which. contained twenty-four heroin capsules, and arrested appellant upon Byrd's entry into the store. Outside, the officers detained and searched one John Johnson, who, Taylor said, was a recipient of one of the manila envelopes, but discovered nothing.

Officer Byrd corroborated Taylor's testimony, except that Byrd testified to seeing only two transactions, one with an envelope and one from the pouch, because her position as Taylor's passenger obstructed her view. She also stated that she did not see appellant dispose of anything inside the drug store, having first seen the pouch when Taylor recovered it from the floor.

Prior to presentation of the defense, appellant's counsel requested and received from the Government notice of its intention to impeach both appellant if he testified in his own behalf, and detainee Johnson if he were a defense witness, with the prior conviction of each for violating the Harrison Narcotic Act. 26 U.S.C. § 4074(a). Defense counsel argued that the impeachment statute here in question denied due process of law to those impeached thereunder, and that pre-statute law should control to exclude the prior conviction evidence. The trial judge, apparently relying on the new statute, stated that he would permit the use of the prior convictions, noting that appellant's objection was preserved for appeal.

Three witnesses were presented for the defense in addition to appellant's own testimony. Detainee Johnson, a friend of appellant, admitted having spoken with him as the officers observed, but denied that any transaction took place and stated that he did not see appellant with narcotics or a yellow pouch. On cross-examination Johnson admitted he had been convicted of a Harrison Act violation three days earlier.[5] One Linwood Thompson, who knew appellant by sight, was in the drug store, observed appellant's entry closely, and saw the arrest of appellant and the recovery of the pouch. He testified that he did not see appellant throw a pouch or make a throwing gesture, and did not see the pouch or money until the officer picked them up. One James Robinson, an acquaintance of appellant, was also in the drug store at the time and, while he did not notice appellant's actions upon the latter's entry, testified that he did observe appellant thereafter and did not see him with a pouch or making a throwing motion with his arm.

Appellant took the stand in his own defense and, while admitting meeting with a number of people as was observed by the officers, denied (1) that any narcotics transactions took place, (2) receiving any money from these persons, (3) possessing narcotics, envelopes, or the yellow pouch, (4) seeing the officers before they entered the drug store, (5) throwing the pouch or money, and (6) seeing the pouch until the officers picked it up. On cross-examination appellant admitted his 1966 Harrison Act conviction.[6] The trial court instructed

---

5. Appellant complains here for the first time that, since the time for taking an appeal from this conviction had not expired, it could not be used for impeachment purposes due to lack of finality. Such impeachment is permissible under a part of the new impeachment statute not here challenged, 14 D.C.Code § 305(d), but, that part notwithstanding, since two of the three defense witnesses were not impeached by prior convictions, admission of Johnson's conviction did not affect appellant's substantial rights. Fed.R.Crim.P. 52(b).

6. Appellant, again for the first time on appeal, challenges the trial judge's failure to give *sua sponte* an immediate cautionary instruction to the jury when appellant's prior conviction was brought out. Immediately following appellant's impeachment, defense counsel—who is also representing appellant on appeal—elicited from appellant on redirect that appellant had served his time and was no longer on parole or probation. Defense counsel then rested his case and, after being asked by the trial judge if he had any special instructions for the jury, made no

the jury that the prior convictions of Johnson and appellant were admissible only for purposes of evaluating their credibility, and that appellant's conviction should not be used to infer his guilt of the offense charged.[7]

*No. 71–1491.*

█ Appellant Marshall was convicted by a jury of all counts in a seven-count indictment arising out of the shooting of one woman and the murder of another in the early morning hours of June 21, 1969.[8] The Government's case as to the surviving victim, Shirlyn Young, included her identification of appellant; its case as to the murder victim was entirely circumstantial.

Victim Young testified that she was able to see her assailant's face during his fifteen minutes in her apartment, and that he then was wearing a yellow shirt, green pants, a round white hat, and black shoes. She stated that she did not identify the assailant in any of the three photographic arrays—none of which included appellant—shown to her in the hospital to which she was taken after being shot but, having earlier made an in-court identification of appellant, said that she did identify appellant at a photographic lineup at her home approximately three weeks after the shooting. Her neighbor testified to seeing, at about the time of the shooting, a man with a gun wearing a yellow shirt and

mention of instructions to limit the use of the prior conviction. In contrast to the Government, which was silent on the matter in its summation, defense counsel again raised appellant's prior conviction in his closing argument, to note the conviction was only to be used in considering appellant's credibility. Defense counsel's own immediate attempts to ameliorate the effect of the impeachment evidence, his argument to limit its use, the Government's omission of further mention of it, and the court's later limiting instructions on this score, all serve to support the view—as defense counsel's failure to object at trial suggests—that the absence of immediate cautionary instructions was not prejudicial error. We do not, in any event, find it cognizable as plain error.

7. Appellant contends that the trial judge's instruction to the jury to give appellant's testimony "only" such weight as it fairly should receive, to which appellant objected, was error in that it lessened the worth of his testimony as compared to that of the other witnesses. This contention is without merit since the instructions made repetitively clear that appellant's testimony was to be accorded the same treatment as that of the other witnesses, "only" being added apparently in the context of the judge's preceding statement that appellant had an absolute right not to take the stand.

Appellant lastly asserts that the trial court's denial of his motion under Fed.R. Crim.P. 33 for a new trial based upon his discovery of a new witness, without a hearing or statement of reasons, denied him due process. The affidavit of the new witness filed in support of the motion attests that he too was in the drug store at the time of appellant's arrest, was approached by appellant upon the latter's entry and did not see

him throw a pouch, and saw the police women drive up to the store only after appellant had been in it one or two minutes. Appellant acknowledges such a motion may be decided on affidavits alone, Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633, cert. denied, 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1942), and we think the affidavit of the witness sufficiently reveals, without more, that the broad discretion of the trial court was soundly exercised here. *See* Thompson v. United States, 88 U.S.App.D.C. 235, 188 F.2d 652, 653 (1951).

8. The counts were first degree murder, 22 D.C.Code § 2401; assault with intent to kill while armed, 22 D.C.Code §§ 501, 3202; assault with intent to kill, 22 D.C.Code § 501; armed robbery, 22 D.C.Code §§ 2901, 3202; robbery, 22 D.C.Code § 2901; sodomy, 22 D.C.Code § 3502; and carrying a dangerous weapon, 22 D.C.Code § 3204.

During the *voir dire* of the jurors, the trial judge, after stating that no one should serve in a capital case who would automatically vote for or against the death penalty, ascertained that no jurors would automatically vote for it but that a number were irrevocably opposed to it. He excused all the latter. The jury ultimately brought in a special verdict of guilty on the charge of first-degree murder, leaving the imposition of punishment to the court since the jurors were unable to agree on the matter. Appellant urges here for the first time that the exclusion denied him a fair trial. In light of the verdict, the absence of objection below, and the absence on appeal of data to suggest the jury's partiality to the prosecution, we think Witherspoon v. Illinois, 391 U.S. 510, 517–518, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), is dispositive.

green pants moving away from the building in which Young lived. The neighbor stated that appellant very much resembled that man.

A neighbor, who lived next to the murder victim's apartment building and a few blocks from that of victim Young's, testified that while sitting on the steps of her own building she saw the murder victim enter the latter's building with a man, heard signs of fighting and gunshots approximately five minutes later, and shortly thereafter saw a man in the murder victim's apartment wearing a white hat who seemed to be the man that earlier had entered the building with the victim. The neighbor said the man with the hat later left the building, and that he had approximately the same complexion, build and height of appellant. The two other persons sitting on the steps at the time corroborated this story, including appellant's general physical resemblance to the individual seen leaving the victim's building. One of these witnesses added that the departing man was carrying a yellow jacket. The murder victim's roommate testified to having earlier played cards with the victim and others in their room; the room was cleaned after all had departed, the roommate noting no cigarettes were left in the ashtray, and that the victim had none. A cigarette was found in the ashtray after the murder; other testimony revealed that appellant smoked, as was observed during his arrest in New York.

The day after the two incidents, appellant, who was wearing green pants and a white cap, was involved in an argument at a gas station. The station manager's complaint to the police of appellant's threatening him with a gun resulted in police seizure of the gun from under the driver's seat of the car appellant was driving. Unchallenged testimony from a ballistics expert established that the two unmutilated bullets recovered, one from the body of each victim, were fired from the revolver seized at the gas station.[9]

At the pretrial hearing on appellant's motion to suppress the revolver, defense counsel raised the question whether, should appellant elect to testify in his own behalf, the court would permit his impeachment by prior convictions. The Government proffered appellant's 1965 conviction for assault with intent to commit grand larceny, and his 1970 conviction for armed robbery. The trial judge stated, apparently with reference to the new impeachment statute, that the matter was no longer subject to question. Defense counsel objected, and said in view of the admissibility of the convictions he would recommend to appellant that he not testify. At trial counsel again sought a ruling on the admissibility of appellant's prior convic-

---

9. Appellant claims here for the first time that mention of two aliases he had used was error. That appellant used a different alias during each of the aforementioned arrests in New York and at the gas station, precipitating their mention during testimony concerning those arrests, makes it clear plain error was not committed by testimonial and other references to those aliases. Similarly, it was proper for the trial court, over appellant's objection, to permit mention of appellant's pointing the seized weapon at the gas station manager, in order to explain ultimate police possession of the weapon, especially when the trial judge issued immediate limiting instructions as to the purpose of the testimony. Further, appellant's complaint that the trial judge erred in denying his motion for acquittal of the first degree murder charge is without support. The facts that there were two victims, both sexually assaulted in apparently the same manner, and both shot, more than once, with the same gun, in close proximity of time and space to one another, suffices not only to distinguish Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967)—upon which appellant solely relies—but also illustrates the sufficiency of the evidence for purposes of denying appellant's motion. And given the inevitability that some inflammatory evidence will reach the jury in this type of case as relevant to such matters as how and why the offense was committed, the Government's own decision not to display the more shocking exhibits and the court's exclusion of others, we cannot say the admission of the testimony and photographs challenged as unduly prejudicial was error,

tions. The trial judge stated the admissibility of both convictions was mandated by the new statute, while advising appellant of his right to testify. Appellant did not testify.

■■■■ The defense was alibi and mistaken identity.[10] Appellant's brother testified that appellant was home at the time of the offenses charged. An acquaintance of appellant's testified that the day before appellant was arrested at the gas station, and after the shootings with which he was charged, a third party who knew appellant approached him and the witness, and sold appellant a gun which looked to be the same as the one used to shoot the two victims. A number of witnesses were also brought forward to support the theory that someone other than appellant committed the offense, see note 10 supra.[11]

*No. 71–1497.*

Appellant Brown was convicted by a jury of unlawful possession of stolen mail matter—specifically, a civil service retirement check payable to one Frances M. Wright—in violation of 18 U.S.C. § 1708. The prosecution was directed toward establishing that appellant knew the check in his possession was stolen. The Government's theory of the case was that appellant, in league with others, stole the check in question and forged the payee's endorsement. It was stipulated that the endorsement was not in appellant's handwriting.

Testimony elicited by the Government revealed that the check was mailed to the payee on April 15, 1970, but that her mailbox was broken into on April 17 and that she never received the check. Appellant's neighbor, Miss Gray, a Post Office employee, testified that on April 22 appellant asked her to cash the check for him while she was at work. She stated appellant gave no reason for his request, and that he apparently had his own bank account, since the week before he had written a check payable to her as a loan. Circumstances led her to discuss the request with her supervisor. She was ad-

---

10. Appellant contends as he did at trial that the failure of the Government to disclose before trial six documents which were provided during the proceeding constituted a denial of due process. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It is asserted that this failure prevented pretrial efforts by the defense to develop reasonable hypotheses concerning other persons who may have committed the offenses charged, the presence of which might have caused the jury to entertain a reasonable doubt as to appellant's guilt. Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209 (1967). We disagree that an earlier disclosure would have produced the uncertainty required to find prejudicial error. The relative lack of persuasiveness of the hypotheses is indicated by the fact that at no time during trial did defense counsel request a continuance, although the court's willingness to assist the defense was suggested by its provision of opportunities to study new material when requested by counsel and its issuance of two forthwith subpoenas for persons whom those statements served to identify as useful to the defense. The disclosures that were made permitted defense counsel to argue to the jury in closing that six other persons could have committed the murder with which appellant was charged. The one apparently considered the most serious "sus-

pect" by appellant—one of those who played cards with the victim on the evening of the murder—was cross-examined extensively by defense counsel with the most relevant document in hand, and a Government witness explained the appearance of blood on that suspect's body in a manner indicating no connection with the murder. The incremental advantage of pretrial disclosure of evidence that was presented to the court and jury would not in our view have so hardened the speculative possibilities urged by appellant as to this and the other suspects (none of whom matched appellant's description) that the foundation for the jury's verdict might have been shaken.

11. Our examination of the 1000-page record in this case convinces us that, contrary to appellant's final claim, the trial judge displayed no overt prejudice against defense counsel, nor did his limitation of counsel's opening statement to what the defense—and not the Government's—evidence would show constitute harassment. His statement in the instructions to the jury that the Government's investigation was thorough and completely fair served to offset defense counsel's contrary suggestion, and certainly, as a few sentences appearing in over 30 pages of instructions, did not rise to the level of denying appellant a fair trial.

vised to, and did, meet with appellant at noon as he had arranged, and returned the check, whereupon a postal inspector arrested appellant and seized the check.

Over objection, the trial judge ruled the inspector qualified as an expert in stolen checks after a *voir dire* conducted outside the presence of the jury. The inspector revealed that it was not uncommon for one person to steal the check, another to forge the endorsement, and a third to cash it. He gave an example from his experience wherein, prior to an attempt to purchase his merchandise by a check with a forged endorsement, a merchant was alerted by telephone that the caller was sending a purchaser who would present the caller's check, and was asked to cash the check.[12]

Appellant was convicted of false pretenses in 1959, and of forgery in both 1964 and 1966. Believing the Government would attempt to use these convictions to impeach appellant were he to testify, appellant filed a pretrial motion contending that such an attempt would violate his constitutional rights. The trial judge denied the motion in reliance upon the new impeachment statute; and he informed appellant that the convictions would be admissible for impeachment purposes if appellant took the stand. Appellant chose to testify.

Appellant's version had it that he was approached in early April by a person representing himself to be a "Mr. Wright," who was referred to appellant by his neighbor, Miss Gray. Mr. Wright asked appellant to perform certain plumbing repairs on two fire-damaged houses. After making an estimate, appellant asked for an advance to purchase the necessary materials. On April

20, Mr. Wright met with appellant, endorsed the check in question in appellant's presence, and gave him the check and a list of supplies to purchase at the Apex Plumbing Company, where Mr. Wright said he was known. The aforementioned stipulation also noted that the list was not in appellant's handwriting, and that both the list and the forged endorsement were in the same handwriting.

Appellant went to Apex and presented the list and check. Apex refused to cash the check. Appellant called Mr. Wright; the Apex manager spoke to him, but still would not cash the check. On April 22, appellant asked his neighbor to cash the check, and, in closing, it was argued to the jury in his behalf that he did not have a checking account. Appellant stated he did not know the check was stolen until he was arrested with the check, as well as the list of plumbing supplies, in his possession.

Defense witnesses included the Apex manager, who remembered appellant presenting the check and list of supplies and the telephone call with Mr. Wright. A number of witnesses called attested that, despite appellant's affliction with polio, he did work as a plumber. And a Secret Service Agent, to whom appellant was turned over after his arrest, presented a statement then made by appellant corroborative of appellant's testimony.

Cross-examination revealed that circumstances prevented appellant from obtaining Mr. Wright and one "Duck"—a helper appellant asked to assist appellant in the Wright job—as defense witnesses. Appellant admitted his three prior convictions earlier men-

12. Appellant contends that this testimony was inadmissible, but his attempt to distinguish United States v. Jackson, 138 U.S. App.D.C. 143, 425 F.2d 574 (1970), fails. Testimony concerning the *modus operandi* of theft-forgery operations would clearly have aided the jury, unfamiliar with such matters, in forming an opinion as to the credibility of appellant's version of his possession; the inspector was unquestionably an expert in the field; the jury was instructed his testimony was to be weighed like all other evidence; and his testimony as to a particular experience was merely illustrative of a common practice that served to give that practice meaning to the uninitiated. To the extent that the testimony served to cast appellant's version in a darker light, its probative value outweighed whatever prejudicial effect it may have had.

tioned, while each time adding that he pleaded guilty to the charges. At the close of trial, the judge instructed the jury to consider those convictions only to assess appellant's credibility.[13]

## II

Prior to the effective date of the new impeachment statute, *see* note 2, *supra,* its predecessor provided that the fact of a witness' prior conviction *"may* be given in evidence to affect his credibility," 14 D.C.Code § 305 (1967) (Emphasis added). In 1965 we interpreted that language as empowering the trial judge to admit the prior convictions of a defendant testifying in his own behalf, but not as invariably requiring such admission. It was our view that the language used by Congress did not, either in terms or intention, negate the existence of a discretionary power more likely to further the achievement of the goal of a criminal trial, *i.e.,* "the disposition of the charge in accordance with the truth." Luck v. United States, 121 U.S.App. D.C. 151, 348 F.2d 763, 769 (1965).

With this objective in mind, the principal consideration in the exercise of that discretion would be whether "the prejudicial effect of impeachment far outweighs the probative relevance of the prior conviction to the issue of credibility." *Id.,* at 768. And our apprehension embraced not only the possibility that admission of prior convictions would have an improper influence upon the jury's deliberations upon a defendant's guilt, but also that a defendant might perceive the same possibility and be thereby deterred from giving testimony in his behalf. In such situations, we thought a trial judge should be able to resolve the question of whether the pursuit of truth would better be served by permitting the defendant to testify without fear of impeachment.

In *Luck* we identified various factors we thought might appropriately inform the decision of a trial judge on this question; and in Gordon v. United States, 127 U.S.App.D.C. 343, 383 F.2d 936 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968), we

---

13. Appellant claims that he was denied due process by the trial judge's display of obvious bias against the defense, citing five episodes of assertedly improper judicial conduct. We think appellant received, if not a perfect trial, at least a fair one. The court's use of the word "defendant" when defense counsel said "my client, Larry L. Brown" appears from the record to have been no more than a clarifying reference; and his qualified statement that the Government appeared to have impeached appellant by previous inconsistent testimony was rectified by his instruction to the jury the following day to disregard the Government's attempt since the record did not support it. The three instances of comment, when defense counsel attempted to elicit certain information, to the effect that counsel "knows better" are more questionable. The first comment, however, came on the heels of two prior sustained objections to defense efforts to explain appellant's prior convictions, the last effort questioning whether appellant had been represented by counsel. The second comment was prompted by a succeeding defense effort to elicit appellant's bail status; and the final comment by a defense question to neighbor Gray asking whether she ever

stole any checks. While the court's mode of correcting counsel was not ideal, it was at least not without foundation, nor did it unnerve a persistent defense effort. Neither did the commentary implicitly suggest the judge's antagonism toward the underlying position of the defense in any significant way, so much as it did the judge's own strict view of proper performance of counsel, especially in view of similar commentary directed toward the Government, numerous rulings favorable to the defense, and the court's instructions to the jury that its rulings should not suggest the court's view of how the case should be decided.

The court did not, as appellant asserts, abuse its broad discretion to limit inquiry into the circumstances of appellant's prior convictions. United States v. Boyer, 80 U. S.App.D.C. 202, 150 F.2d 595, 596 (1945). Appellant had already made clear those convictions were predicated on guilty pleas; and even assuming defense counsel could have properly established lack of representation as to one of them, his question above sufficed to make his point, highlighted as it was by the court's admonition. *See* United States v. Crisafi, 304 F.2d 803, 804 (2d Cir. 1962).

explored in detail the proper implementation of *Luck.* Judge (now Chief Justice) Burger, writing for the court in *Gordon,* noted that the responsibility for raising the question of the admissibility of prior convictions was the defendant's, and that he also bore the burden of persuading the trial judge that his prior convictions should be excluded. But, once raised, the defendant was entitled to an on-the-record consideration of the issue; and indeed it was suggested that in some cases a determination could best be made only following a non-jury hearing wherein a defendant would testify and be cross-examined, bringing into sharper relief the nature of the problem posed by the impeachment in question.

 The new statute provides that, if a prior conviction meets the criteria set forth therein, it *"shall* be admitted if offered," *see* note 1 *supra,* (Emphasis added). It replaces the time-honored discretion of trial judges, in ruling on questions of admissibility of evidence, to weigh probativeness against prejudiciality—a discretion which we found Congress preserved in the earlier statute—with a rigid legislative judgment as to which prior convictions must be admitted for impeachment purposes. We think the availability to a criminal defendant of the exercise of judicial discretion in this matter invests him with significant and substantial rights which are nullified by the legislative scheme enacted to replace it. Accordingly, to the extent that that scheme is applied in trials for offenses committed before its effective date, the statute in which it is embodied is condemned as an *ex post facto* law.

 It is generally accepted that laws which make acts criminal which, when done, were not criminal, or those which increase the seriousness of, or provide a greater punishment for, criminal acts over that which obtained when the acts were committed, fall within the

constitutional condemnation as being *ex post facto.*[14] Conversely, changes in procedure customarily are not generally treated as *ex post facto. See, e.g.,* Frisby v. United States, 38 App.D.C. 22, 25 (1912). As *Frisby* noted, however, it has been clear, beginning with the first case in which the Supreme Court was called upon to construe the clause, that procedural changes can be *ex post facto, id.,* at 25; and that those changes include alterations in the rules governing the admissibility of evidence.

The Supreme Court's initial pronouncement on the *ex post facto* clause held that an enactment of the Connecticut legislature setting aside a probate decree was not prohibited by the clause because the enactment did not relate to penal matters. Calder v. Bull, 3 U.S. (3 Dall.) 269, 1 L.Ed. 648 (1798). In so limiting the scope of the clause the Court also set forth, through Mr. Justice Chase, what laws it thought to be within the prohibition, and those included:

> . . . Every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender . . . *Id.* at 273.

In Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866), the Court struck down as *ex post facto* the clause in the Missouri Constitution—there applied to a Catholic priest—punishing those who held office and did not take the loyalty oath constitutionally required of the clergy and others which stated, *inter alia,* that the taker had never manifested support for the confederacy. The Court in part characterized the clauses in question as operating to "subvert the presumptions of innocence, and alter the rules of evidence," theretofore thought to have been fundamental. *Id.* at 328.

Kring v. Missouri, 107 U.S. 221, 2 S. Ct. 443, 27 L.Ed. 506 (1882), similarly

---

14. *See, e. g.,* Field, Ex Post Facto in the Constitution, 20 Mich.L.Rev. 315 (1921); Crosskey, The True Meaning of the Consti- tutional Prohibition of Ex Post Facto Laws, 14 U.Chi.L.Rev. 539 (1947).

invalidated a Missouri constitutional provision which had been interpreted to abrogate pre-existing law that made judgment and sentence for second degree murder, where first degree murder had been charged, an acquittal of the first degree charge. The Court held that

> . . . the Constitution of Missouri so changes the rule of evidence, that what was conclusive evidence of innocence of the higher grade of murder when the crime was committed . . . is not received as evidence at all, or, if received, is given no weight in behalf of the offender. . . . *Id.* at 228, 2 S.Ct. at 449.

Our own court held long ago in *Frisby, supra,* that a statute repealing an earlier enactment prohibiting the use as evidence against a criminal defendant of his pleadings in another judicial proceeding was *ex post facto* in nature, since it rendered admissible a forged document which was the sole proof of the commission of the offense charged. *Id.* at 27. And earlier this year we held in United States v. Williams, 154 U.S.App.D.C. 244, 475 F.2d 355 (1973), that a provision of the D.C. Court Reform and Criminal Procedure Act, which placed upon the defendant the burden of affirmatively establishing an insanity defense by a preponderance of the evidence, was invalid as an *ex post facto* law when applied to an offense committed before the effective date of the statute. *See also* United States v. Gilbert, No. 71–1687, decided without opinion but citing *Williams.*

In those cases in which the Supreme Court held the challenged procedural change not to be *ex post facto,* it never-

theless acknowledged that such changes could on occasion fall within the prohibition. Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (upheld repealer of statute preventing convicted felons from being witnesses); Thompson v. Missouri, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898) (upheld statute which made admissible previously excluded genuine examples of defendant's handwriting); Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) (upheld statute which provided for separate trial for good cause shown, rather than previously accorded right to separate trial).[15]

What is, or is not, a procedural change amounting to an *ex post facto* law depends, then, upon its effect on the accused. The effect has been variously stated. *Kring, supra,* quoted with approval from United States v. Hall, 2 Wash. C.C. 366, that a law is *ex post facto* which " 'in relation to the offence, or its consequences, *alters the situation of a party to his disadvantage . . . takes away or impairs the defence* which the law had provided the defendant' " at the time of the offense. 107 U.S. at 228–229, 2 S.Ct. at 449–450. (Emphasis added.) *Kring* also held that a law of procedure will be *ex post facto* where it takes away *"any substantial right"* which the law gave the defendant at the time to which his guilt relates," *id.* at 232, 2 S.Ct. at 453, and this latter formulation appears consistently in the later cases, as to the other phrases with less consistency. *See Hopt, supra,* 110 U.S. at 589, 4 S.Ct. 202; Thompson v. Utah, 170 U.S. 343, 352, 18 S.Ct. 620, 42 L.Ed. 1061 (1898); Thompson v. Missouri, *supra,* 171 U.S. at 384, and at 388, 18 S.

---

15. *Hopt* stated:

> . . . Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be [*ex post facto*], 4 S.Ct. at 210. . . . *Id.* at 590.

Thompson v. Missouri made clear that:

> . . . The [challenged] statute did not require 'less proof, in amount or de-

gree,' than was required at the time of the commission of the crime charged upon him . . . *Id.* at 387, 18 S.Ct. at 925. And *Beazell* noted earlier authority providing that the "constitutional limitation may be transgressed by alterations in the rules of evidence," but only if they "do not deprive the accused of a defense and . . . operate only in a limited and unsubstantial manner to his disadvantage . . . ." *Id.* at 170, 46 S.Ct. at 69.

Ct. 922 ("substantial guarantees"); Beazell, supra, 269 U.S. at 171, 46 S.Ct. 68; Frisby, supra, 38 App.D.C. at 25.

While the question before us may thus be cast in the mold of whether appellants have been deprived of a "substantial right," it is evident that:

> Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree . . . . Beazell, supra, at 171, 46 S.Ct. at 69.

The right we are here dealing with is the right of an accused to invoke the exercise of the trial judge's discretion, informed by the factors set forth illustratively in Luck and Gordon, supra, in ruling on the admissibility of the accused's prior convictions. Whether the retrospective application of the new impeachment statute worked a deprivation of a substantial right depends upon the nature and degree of the disadvantage to the accused imposed by the substitution of a fixed legislative judgment for a judge's informed discretion on this issue. We conclude that the particularized consideration which this claim of an accused has heretofore received is a protection of the magnitude necessary to involve the ex post facto clause.[16]

The prejudice against which the Luck rule was designed to protect an accused —the effect of prior convictions in creating an inference of guilt rather than in merely evaluating the accused's credibility—may be overborne by the governmental interest in admitting the evidence for impeachment purposes, but that prejudice exists nonetheless. See Spencer v. Texas, 385 U.S. 554, 561, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Dixon v. United States, 287 A.2d 89, 93 (D.C. C.A.1972). And it is especially noticeable in those cases one might posit where, absent the new statute, the trial judge might have excluded otherwise admissible prior convictions. In those circumstances Congress presumably may have concluded that the governmental interest should in any event prevail—but that is a judgment which deprives the accused of a substantial right in two significant ways, whether or not the judgment is otherwise constitutionally permissible.

First, the prejudice flowing from the admission of convictions for past offenses, which we need not belabor here, inevitably operates to dilute the impact upon the jury of the accused's testimony as to his innocence of the offense for which he is presently on trial. Luck, supra, 348 F.2d at 768. This possibility remains despite the issuance of limiting instructions. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). As such it may make the Government's burden of proof less onerous which—whatever effect it may have on the constitutional requirement that the Government bear the burden of proof beyond a reasonable doubt, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)—would in turn result in a conviction on "less . . . testimony than the law required at the time of the commission of the offence . . . ." Calder, supra, at 273. See also Cummings, supra, at 326. It was the absence of just such an effect that the Court pointed to in upholding the challenged statutes in Hopt and Thompson v. Missouri.[17]

16. Our decision on the ex post facto ground in these cases dispenses with the necessity of our addressing the challenge raised in each one to the constitutionality of the new statute under the Due Process Clause.

17. See note 15 supra. In Thompson v. Utah, supra, the Court held ex post facto a provision of the constitution of the new state of Utah permitting trial by eight jurors when, at the time of the offense, the Territory of Utah had been under federal statutes requiring a jury of twelve. The "substantial right" there involved was what was then understood (compare Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)), to be the federal constitutional right in criminal trials to a unanimous verdict of twelve jurors. 170 U.S. at 353, 18 S.Ct. at 620. The increased likelihood of

Second, the new statute may—as it perhaps did in the case of appellant Marshall, especially since he faced a possible death sentence—operate in such a manner that it "takes away or impairs the defence which the law had provided the defendant," *Kring, supra,* at 229, 2 S.Ct. at 450. The defense at issue here is the testimony of the accused himself; and, while he had the right to testify in his own behalf, it may nonetheless be a significantly diluted right if the risk of the above-described prejudice flowing from the mandatory admission of his prior convictions is so high that he is deterred from invoking that right. *See* United States v. McCord, 137 U.S.App.D.C. 5, 420 F.2d 255, 257 (1969); Kalven & Zeisel, The American Jury 146–47 (1966). *Cf. Luck, supra,* 348 F.2d at 769; *Gordon, supra,* 383 F.2d at 940. And to the extent this deterrence is determinative in a situation where an accused's testimony is his only defense, its effect is self-evident even if it may not be unconstitutional. *Cf.* McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).[18]

■ When viewed as a statute which may not only lessen the amount of proof required for conviction, but also as one which may in practical effect impair or wholly take away a defense that might, absent the new statute, have been available, it is clear that statute potentially "alters the situation to the disadvantage of the defendant" within the meaning of the *ex post facto* clause as construed by the Supreme Court. Accordingly, the statute is unconstitutional in its retroactive application to the cases before us.[19]

### III

In each of these cases appellants raised in timely fashion the question of whether, should they testify in their own behalf, their prior convictions would be admissible. In each instance the trial judge considered himself precluded by the new statute from bringing to bear on that question the discretionary elements which might conceivably have resulted in a ruling of exclusion. Jeffries, Henson and Brown each elected to testify, while maintaining, on various constitutional grounds, their objections to the new statute and its application to them. Marshall elected not to testify on the advice of his attorney, of which advice the judge knew in advance of his ruling. *See* Williams v. United States, 129 U.S.App.D.C. 322, 394 F.2d 957, cert. denied, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968).

We cannot say, in view of the "inescapable remoteness of appellate review," *Luck, supra,* 348 F.2d at 769, how an informed discretion would have been exer-

---

unanimity with eight jurors, which the Court at that time regarded as making acquittal less likely, is analogous to the decreased likelihood of acquittal here by reason of the new statute's mandatory admission of prior convictions.

18. Yet another factor bears mention in this regard, raised in Thompson v. Missouri, *supra,* where the Court, in upholding the statute making a defendant's pleadings from a prior proceeding admissible, said the statute did not

give the prosecution any right that was denied to the accused. It placed the State and the accused upon an equality; for the rule established by it gave to each side the right to have disputed writings compared with writings proved to the satisfaction of the judge to be genuine. . . . 171 U.S. at 387–388, 18 S.Ct. at 925.

This saving principle of reciprocal advantage or disadvantage, although not entirely absent here since the impeachment statute applies to prosecution witnesses as well as to the defendant, is largely diluted in practical fact. Few would deny that it bears most heavily on the criminal accused.

19. In so holding we are aware of the contrary position taken on this point by the District of Columbia Court of Appeals. Dixon v. United States, 387 A.2d 89 (D.C. C.A.1972). We cannot agree, however, that here—as was found there—the application of the new statute and the consequent inability of appellants to have their claim considered by the trial judge "did not deprive [appellants] of any defense, modify the elements of proof, or deny [appellants] any substantial immunity" which existed earlier. 287 A.2d at 97.

cised, nor do we think it appropriate for us to volunteer any views as to how it should have been exercised or whether the failure to exercise it was harmless error. Those are matters more properly to be determined in the first instance by the District Court on remand.[20]

The convictions appealed from are affirmed in all respects except that the cases are remanded to the District Court for the purpose of enabling that court to consider, free of the constraints of the statute in question, whether impeachment by prior conviction should have been permitted. In any case where the court concludes that it should not have been, and where the court does not find the error to have been harmless, it shall afford a new trial.

It is so ordered.

BAZELON, Chief Judge, concurring in part and dissenting in part:

I agree with the Court that 14 D.C. Code § 305, as applied to defendants whose offenses were committed prior to its effective date, is an *ex post facto* law. I concur, therefore, in remanding the cases to allow the District Court to consider, under the *Luck* rule,[1] whether evidence of prior convictions should have been admitted.

My disagreement with the Court concerns only its holding in the *Henson*

---

20. Our disposition of these appeals also enables us to forego consideration of what we consider to be an important question raised in respect of the Henson and Brown cases, both of which were prosecutions for United States Code offenses as contrasted with the Jeffries and Marshall prosecutions under the District of Columbia Code. If the new D.C. impeachment statute is to be interpreted as applicable to federal criminal trials, it would mean, first, that the federal courts in the District of Columbia would be placed upon a different footing, with respect to the admissibility of evidence of prior convictions, from the federal courts in the other ten circuits, which remain free to devise their own rules of admissibility under Fed.R.Crim.P. 26 irrespective of the rule of the local jurisdiction in which they sit. *See*, e. g., United States v. Woodall, 438 F.2d 1317, 1327 (5th Cir. *en banc* 1971).

Second, it would place criminal defendants prosecuted in the federal courts of the District of Columbia on a different footing from those tried in any other federal circuit, although both classes of defendants may be charged under the same U.S.Code provisions. This treatment of similarly situated persons in a different fashion is fraught with equal protection overtones. *See* United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971) ; *cf.* Long v. Robinson, 316 F. Supp. 22 (D.Md.1970). More importantly, as the Government properly concedes, the federal courts here are established by Congress pursuant to its power under Article III of the Constitution, and as such are invested with the same "judicial Power of the United States" as are all other inferior federal courts. Whether they may, in the context of the cases before us, be singled out for different treatment from Article III

courts elsewhere raises serious constitutional questions.

It may be that, in view of the substantial similarity between Rule 609, Proposed Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183 (1973), and the new impeachment statute here challenged, the ultimate effectiveness of the Rules, in the form submitted by the Court to Congress, may remove this disparity of treatment. However, those Rules retain, in Rule 403, the general principle that "relevant . . . evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." On the question of whether the specificity of Rule 609 prevails over this general principle, *see*, e. g., the testimony of Judge Friendly in Hearings before the Special Subcommittee on Reform of Federal Criminal Laws, of the House Committee on the Judiciary, on Proposed Rules of Evidence, 93d Cong., 1st Sess., Ser. 2, at 251–52 (1973).

In any event, it is not clear at the moment what shape the Federal Rules of Evidence may finally take. Following the signing into law of P.L. 93–12, 87 Stat. 9 (March 30, 1973), which provides that the Rules will not take effect unless Congress affirmatively enacts them, the House Subcommittee on Criminal Justice of the Committee on the Judiciary has proposed changes to Rule 609 which reinstate, at least in very large part, the discretionary balancing of unfair prejudice and probative value in considering impeachment by prior convictions. H.R. 5463, 93d Cong., 1st Sess. (June 28, 1973).

1. Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965).

case, contained in footnote six of the Court's opinion, that it was harmless error in the circumstances of the case for the trial court to fail to give, *sua sponte,* an immediate cautionary instruction regarding the limited purpose for which evidence of former convictions, may be used. The Court says that, in any event, it does not find this omission cognizable as plain error.

There is no question, of course, that if evidence of Henson's prior Harrison Act conviction was admissible at all, it was admissible only for the purpose of evaluating the credibility of his testimony in his own behalf. Nor is there any question that such evidence, when admitted, can have a significant prejudicial effect, particularly when the former conviction was for an offense similar to that for which the defendant is being tried. When it decides to admit such evidence, the trial court should be aware, without prompting of counsel, of the special dangers posed to the fairness of the trial. It is, in my view, incumbent upon the court to take whatever steps necessary to mitigate these dangers as much as possible. And while the immediate cautionary charge is, I grant, a fragile reed upon which to rely, it is the best device available for reducing the possible prejudicial effects of prior conviction evidence.

Despite its erosion in subsequent cases,[2] I would adhere to the rule stated in McClain v. United States: [3]

> We would hold that whenever evidence is admitted only for a limited purpose, it is plain error, in the absence of manifest waiver, to omit an *immediate* cautioning instruction. The danger of prejudicial effect from such evidence is so great that only an immediate and contemporaneous instruction can be considered sufficient to protect de-

fendants. As long as we continue to have rules of evidence which admit testimony for some purposes but not for others, we must guard against its misuse by the jury.

Moreover, I cannot agree that the trial court's failure to abide by this rule was, in the *Henson* case, harmless error. The Court recognizes the "inescapable remoteness of appellate review;"[4] yet it would attempt to estimate the quantum of benefit that might have been derived had the immediate instruction been given in this case. The Court may well be correct in its conclusion that, in fact, the quantum of benefit would have been negligible. But, of course, its conclusion rests entirely and necessarily on speculation, the premises of which are uncertain at best.

Such speculation may often be a necessary, if unfortunate, aspect of the appellate function, and I have no doubt that the harmless error rule may be appropriately applied, particularly when an error concerns matters peripheral to the central issues in a case. Here, however, I think the Court's enthusiasm for the harmless error rule is altogether misguided. The requirement of an immediate cautionary instruction is intended to mitigate a substantial danger to the fairness and accuracy of the guilt-determining process. In my view, it profits neither the cause of judicial efficiency nor what is more important, the administration of justice, to announce a rule and then to undercut it by repeatedly pronouncing its violation harmless. Reluctant as we are to "overload the system" by requiring that a case be retried, by refusing to do so we may well defeat the goal for which we strive. It is, I think, precisely our readiness to find an error harmless that makes it likely to recur and thus to be again and again the

2. *See, e. g.,* United States v. Fench, 152 U.S.App.D.C. 325, 470 F.2d 1234 (1972); United States v. Thomas, 148 U.S.App.D.C. 148, 459 F.2d 1172 (1972); United States v. Mizzell, 146 U.S.App.D.C. 399, 452 F.2d 1328 (1971); United States v. Bobbitt, 146 U.S.App.D.C. 224, 450 F.2d 685 (1971).

3. 142 U.S.App.D.C. 213, 440 F.2d 241, 246 (1971) (emphasis supplied). *See* United States v. Gilliam, 157 U.S.App.D.C. 375, 484 F.2d 1093 (1973).

4. Luck v. United States, *supra* note 1, 348 F.2d at 769, *quoted* in the majority opinion, *supra,* at 1308.

subject of our review. Adherence to a straightforward rule may do much to ensure consistency in our administration of justice and, in the long run, to promote its efficiency.

With the exception of this point, I concur in the judgments and the opinion of the Court.

