Roosevelt F. PALMORE, Appellant,

v.

**SUPERIOR COURT OF the DISTRICT OF COLUMBIA et al.**

No. 74–1832.

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 1975.

Decided July 9, 1975.

Frank F. Flegal, Washington, D. C., for appellant in No. 74–1832.

Albert H. Turkus, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Warren R. King, Craig M. Bradley, and Tobey W. Kaczensky, Asst. U. S. Attys., were on the brief for appellees.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVEN- THAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

Opinion for the Court filed by Circuit Judge TAMM.

Dissenting opinion filed by Circuit Judge ROBB.

TAMM, Circuit Judge:

This case and its companion, Pressley v. Swain, No. 73–1975, also decided today, present the important question whether Congress, by enacting 23 D.C. Code § 110(g) (1973), as part of the District of Columbia Court Reform and Criminal Procedure Act of 1970, eliminated the jurisdiction of the United States District Court for the District of Columbia to entertain post-conviction petitions for writs of habeas corpus brought by individuals convicted in the Superior Court. Answering that question negatively, we reverse the district court's dismissal of such a petition for lack of jurisdiction and remand for consideration on the merits.

I

On February 23, 1971, appellant Palmore was indicted in the Superior Court of the District of Columbia for carrying a pistol without a license in violation of 22 D.C.Code § 3204 (1973). Prior to trial, he unsuccessfully moved to suppress evidence on fourth amendment grounds, and thereafter, was convicted in a non-jury trial and sentenced. A. 12–44.[1] Palmore appealed to the District of Columbia Court of Appeals which, passing fully upon his fourth amendment claim, affirmed his conviction. Palmore v. United States, 290 A.2d 573, 580–84 (D.C.Ct.App.1972). On further review the Supreme Court affirmed his conviction without considering Palmore's fourth amendment claim. Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973).[2]

1. Appellant was sentenced to two to six years imprisonment. Except for six months, execution of the sentence was suspended, and Palmore was placed on probation for six years. A. 45.

2. The Supreme Court postponed the question of its jurisdiction until consideration of the merits. The Court eventually decided that review from the District of Columbia Court of Appeals would be by certiorari rather than ap-

Before the Supreme Court's mandate had issued, Palmore petitioned for a writ of habeas corpus in the United States District Court for the District of Columbia, alleging that he was being held in custody in violation of the fourth amendment. On July 10, 1974, the district court dismissed his petition on the ground that "Congress has deprived this Court of jurisdiction by providing in 23 D.C.Code § 110(a) that post-conviction collateral attack upon convictions in the Superior Court of the District of Columbia may be made by motion in that court. . . ."[3] This appeal followed.

Appellant makes two arguments in support of jurisdiction—one statutory, the other constitutional.[4] First, he argues that 23 D.C.Code § 110(g) should not be construed to deprive the district court of its traditional habeas corpus jurisdiction because Congress itself never intended such a result. Second, he contends that if section 110(g) divests the district court of its jurisdiction, the statute is unconstitutional because it: (1) constitutes a suspension of the writ of habeas corpus contrary to article I, section 9, clause 2 of the Constitution[5] and (2), denies him the equal protection of the laws inherent in the due process clause of the fifth amendment.

The Government, in opposition to each contention advanced by appellant, initially argues that the statute is clear on its face, and the only possible construction of it precludes post-conviction relief in the United States District Court for the District of Columbia for an individual convicted in Superior Court. Further, the Government contends that section 110(g), so construed, is a proper exercise of Congress' power to define and limit the jurisdiction of federal courts, is not a suspension of the writ of habeas corpus, and does not create an irrational classification in violation of the equal protection guarantee of the due process clause.

■ As discussed in detail below, we conclude that section 110(g) does not so restrict the jurisdiction of the district court, but is merely an exhaustion of remedies requirement. Acceptance of the Government's construction would result in significant changes in habeas corpus jurisdiction traditionally exercised by the federal courts, and force us directly to confront serious and significant constitutional questions; the Government would have us take this route into previously uncharted constitutional waters without a scintilla of Congressional intent to endorse it. Instead, we conclude that Congress never intended to affect the federal courts' habeas jurisdiction by enacting section 110(g). In so doing, we reaffirm the concept that statutes should be interpreted to avoid difficult constitutional questions, questions which necessitate in this case inquiry beyond the face of the statute to its legislative history. This inquiry leads us to a result consistent with that legislative history and the primary purposes behind the Court Reform Act itself.

### II

In 1970, Congress passed the District of Columbia Court Reform and Criminal

---

peal, and then granted certiorari limited to the question of whether appellant could constitutionally be tried for a congressionally-enacted criminal offense in other than an article III court. Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973).

**3.** A. 8. The court further noted that § 110 authorized appellant to apply for relief in Superior Court, and he had not done so, nor had he demonstrated why that remedy was "inadequate and ineffective". A. 9.

Palmore had been freed on bail pending direct review of his conviction. The district judge first continued bail pending his disposi-

tion of Palmore's petition and has now continued bail pending this appeal. A. 7, 11.

**4.** As mentioned *supra*, the identical issue was raised and analogous arguments advanced in Pressley v. Swain, No. 73–1975, which was argued before this court the same day as the instant case. Arguments made in *Pressley* have been given the fullest consideration in the preparation of this opinion.

**5.** "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

Procedure Act, Pub.L. No. 91–358, 84 Stat. 473 (Court Reform Act) resulting in a fundamental reorganization of judicial administration in this jurisdiction. *See* Palmore v. United States, *supra*, 411 U.S. at 392 n.2, 93 S.Ct. 1670. Thereafter, courts have struggled to interpret the Act properly and to define the relationship between the court systems it created. *See, e. g.*, McCall v. Swain, 166 U.S. App.D.C. 214, 510 F.2d 167 (1975) (district court jurisdiction and interpretation of 16 D.C.Code § 1901 (1973)); Johnson v. Robinson, 166 U.S.App.D.C. 62, 509 F.2d 395 (1974) (interpreting pre-habeas exhaustion requirement of 24 D.C.Code § 301(k)(7)); M.A.P. v. Ryan, 285 A.2d 310 (D.C.Ct.App.1971) (stare decisis effect of federal decisions for local courts); *cf.* Luck v. Baltimore & Ohio Railroad Co., 166 U.S.App.D.C. 283, 510 F.2d 663, 665–66 (1975) (applicability of *Erie* doctrine to District). The instant case presents another such situation.[6]

**6.** In Pernell v. Southall Realty, 416 U.S. 363, 368 n.4, 94 S.Ct. 1723, 1726, 40 L.Ed.2d 198 (1974), the Court acknowledged the apparently unresolved question of the district court's post-court reform habeas jurisdiction and recognized if section 110(g) stripped the district court of jurisdiction to entertain post-conviction petitions, that raised the issue of whether the Supreme Court "has a special obligation to resolve conflicts between the District's 'local' and 'federal' courts on questions of constitutional law raised in such petitions."

**7.** § 23–110. Remedies on motion attacking sentence

(a) A prisoner in custody under sentence of the Superior Court claiming the right to be released upon the ground that (1) the sentence was imposed in violation of the Constitution of the United States or the laws of the District of Columbia, (2) the court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, (4) the sentence is otherwise subject to collateral attack, may move the court to vacate, set aside, or correct the sentence.

(b) A motion for such relief may be made at any time.

(c) Unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the prosecuting authority, grant a prompt hearing thereon,

23 D.C.Code § 110 (1973)[7] provides for post-conviction relief in the Superior Court of the District of Columbia. Subsection (g) reads:

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section shall not be entertained by the Superior Court or by any Federal or State Court if it appears that the applicant has failed to make a motion for relief under this section or that the Superior Court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

The district court held that this section divested it of jurisdiction to entertain appellant's post-conviction petition for a writ of habeas corpus. A. 8–9.

A

Appellant asserts that the district court erred in this regard. Contrariwise,

determine the issues, and make findings of fact and conclusions of law with respect thereto. If the court finds that (1) the judgment was rendered without jurisdiction, (2) the sentence imposed was not authorized by law or is otherwise open to collateral attack, (3) there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner, resentence him, grant a new trial, or correct the sentence, as may appear appropriate.

(d) A court may entertain and determine the motion without requiring the production of the prisoner at the hearing.

(e) The court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.

(f) An appeal may be taken to the District of Columbia Court of Appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

(g) An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section shall not be entertained by the Superior Court or by any Federal or State Court if it appears that the applicant has failed to make a motion for relief under this section or that the Superior Court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

the Government repeatedly argues that the language of subsection (g) is "clear and unambiguous" and claims that "this Court would be denying the manifest intent of Congress if [we] were to construe the statute in any way other than to preclude post-conviction relief in the District Court for one convicted in the Superior Court." Gov't. Br. at 13. The Government concedes appellant's point that courts often construe statutes to avoid difficult constitutional questions,[8] but asserts that such an approach is inappropriate where the statute's meaning is clear. *See, e. g.,* Jay v. Boyd, 351 U.S. 345, 357 n.21, 76 S.Ct. 919, 100 L.Ed. 1242 (1956); United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333, 1341 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972) (if Congress clearly intended unconstitutional result, court's responsibility is to invalidate the law).

As to the proper methodology to apply when a statute is facially clear and unambiguous, the Government advances the rule of Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) (citations omitted):

> It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.

> Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion.

The Government contends that appellant's argument that the district court's interpretation of the statute receives no support in its legislative history[9] "flies in the face of established principles of statutory construction:"

> Where doubts exist and construction is permissible, reports of the committees of Congress and statements by those in charge of the measure and other like extraneous matter may be taken into consideration to aid in the ascertainment of the true legislative intent. But where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed.

Gov't. Br. at 22–23, *quoting* United States v. Missouri Pacific R.R. Co., 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929) (citations omitted).

██ However, recognizing that statutory construction is, at best, an imperfect science, *see* Schiaffo v. Helstoski, 492 F.2d 413 (3rd Cir. 1974), the Supreme Court has cautioned that "[g]eneralities about statutory construction help us little. *They are not rules of law but merely axioms of experience.* They do not solve the special difficulties in construing a particular statute. The variables render every problem of statutory construction unique." United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952) (emphasis added, citations omitted). The variables in this case include the recognition that section 110(g), passed in an Act creating an independent local court system,[10] may have a significant impact on

---

8. Gov't. Br. at 12; *see, e. g.,* United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed.2d 721 (1903).

9. *See* notes 32–39 *infra* and accompanying text.

10. The Superior Court of the District of Columbia is clearly a court created under Congress' article I legislative powers. Palmore v. United States, *supra,* 411 U.S. at 398–99, 93 S.Ct. 1670.

the traditional jurisdiction of certain article III courts. Indeed, the district court determined that the statute divested it of jurisdiction to entertain appellant's application for a writ of habeas corpus, a construction which implies that Congress has eliminated jurisdiction, presently contained in 28 U.S.C. §§ 2241 *et seq.* (1970), which the inferior article III courts have possessed since the passage of the Judiciary Act of 1789.[11] Section 110(g) would thereby represent a fundamental change in the administration in the District of Columbia of the Great Writ, "the most celebrated writ in the English Law," [12] the effectiveness of which is protected by the Constitution itself. Further, even under this interpretation, Congress has only *partially* divested the district court of its traditional habeas jurisdiction. The bar of section 110(g) only extends to post-conviction collateral attacks; the district court may

entertain petitions for writs of individuals who stand accused of "local crimes" [13] and wish to test the legality of their detention.[14]

 Under the Government's clear meaning construction, the inferior article III courts would not be the only courts affected, since the operative language of section 110(g) bars entertainment of petitions for writs of habeas corpus by "*any* Federal or State Court", ostensibly including the Supreme Court of the United States. *See* 11 D.C.Code § 101(1)(A) (1973). This reading of section 110(g) would divest the Supreme Court of jurisdiction to entertain motions for "original" writs of habeas corpus [15] in situations like the one at bar, overturning nearly two hundred years of practice.[16] Granted this "original" writ has lost much of its practical utility,[17]

11. *See* Judiciary Act of 1789 § 14, 1 Stat. 73, 81–82 (1789).

12. 3 Blackstone's Commentaries 129.

13. The term in this context refers to congressionally enacted criminal statutes applicable only to the District of Columbia and codified in the District of Columbia Code.

14. Of course, the courts in their discretion may decline to exercise their jurisdiction. As yet unresolved is the applicability of the *Younger* line of cases to the relationship of the District's two court systems, especially if there is no post-conviction collateral attack available in the article III courts. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see* Pernell v. Southall Realty, *supra,* 416 U.S. at 368 n.4, 94 S.Ct. 1723.

15. *See* 28 U.S.C. § 2241(a), (b) (1970). This "original" writ of habeas corpus is part of the Supreme Court's appellate jurisdiction, *see* Ex parte Bollman, 8 U.S. (4 Cranch) 75, 94–95, 2 L.Ed. 554 (1807), which under article III is subject to exceptions that Congress may provide. *See generally,* Oaks, The "Original" Writ of Habeas Corpus in the Supreme Court, 1962 Sup.Ct.Rev. 153. It is clear that the Supreme Court, aside from section 110(g), would have appellate jurisdiction to issue the writ on behalf of one convicted in Superior Court. *See* Palmore v. United States, *supra*; United States v. Coe, 155 U.S. 76, 86, 15 S.Ct. 16, 39 L.Ed. 76 (1894); Oaks, *supra,* at 166–67.

16. The Supreme Court has protected its habeas jurisdiction and has construed Congressional attempts to eliminate it narrowly. For example, in the famous case of Ex parte McCardle, the Court upheld a statute withdrawing *the 1867 grant of appellate jurisdiction in habeas corpus cases.* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868). Less than a year later, the Court held that the repeal did not affect its original habeas jurisdiction under the 1789 Judiciary Act. Ex parte Yerger, 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1868). Thus, the Court retained power to review cases like McCardle's through original writs of habeas corpus and certiorari.

17. In the Nineteenth Century, the Court used the writ expansively in aid of its jurisdiction. *See,* e. g., Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873); Ex parte Yerger, *supra.* The return of appellate jurisdiction in 1885 and the 1891 grant of review of federal criminal convictions reduced the use of the writ. *See* Oakes, *supra* note 17, at 181–82. The development of both the statutory and common-law writs of certiorari has now made the original writ an "anachronism". *Id.* at 182–189, 206.

In this century, the Court apparently has granted an original writ only three times. Hart & Wechsler's The Federal Courts and The Federal System 1431 (2d ed. 1973); *see* Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527 (1925); Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919); Matter of Heff, 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905). Nevertheless, motions for leave to

nonetheless its availability has been utilized, especially by *pro se* prisoners' petitions.[18]

Not surprisingly, a statute with such significant jurisdictional effects raises difficult constitutional questions. These constitutional issues—whether section 110(g) constitutes an improper suspension of the Great Writ and whether by singling out those convicted of local District of Columbia crimes for eliminating access to the article III courts Congress has violated the concept of equal protection of law—form the backdrop for our consideration of Congress' intent in enacting section 110(g). While we need not resolve these difficult questions now, a brief overview of these unique and perplexing problems is important to an understanding of our approach to construing the statute.

### B

#### 1. *The Suspension Clause*

Appellant's constitutional argument concerning the suspension clause, article I, section 9, clause 2, is that it acts as a restraint upon Congress' control over the jurisdiction of the inferior article III courts, and that once Congress created those courts and vested them with habeas jurisdiction, it may only substitute a remedy "exactly commensurate" with the Great Writ. Section 110, appellant reasons, is not a commensurate remedy, and thus an unconstitutional suspension because the article III salary and tenure protections were not extended to Superior Court judges. To resolve these con-

tentions would require us to pass directly upon fundamental and extremely prickly questions concerning the nature of the judicial system.

■ Habeas corpus holds a unique position in our constitutional scheme. It is nowhere directly constitutionally endowed, but the Constitution, through the suspension clause, protects against its interference.

■ This must be contrasted with Congress' authority to control the jurisdiction of the inferior article III courts. *See, e. g.,* Palmore v. United States, *supra,* 411 U.S. at 400–02, 93 S.Ct. 1670; Cary v. Curtis, 44 U.S. (3 How. 236, 244–45, 11 L.Ed. 576 (1845). Thus, Chief Justice Marshall could note on the one hand in Ex parte Bollman, 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554 (1807), "the power to award the writ by any of the courts of the United States, must be given by written law," and on the other state:

It may be worthy of remark, that this act was passed by the first congress of the United States, sitting under a constitution which had declared "that the privilege of the writ of *habeas corpus* should not be suspended, unless when, in cases of rebellion or invasion, the public safety might require it." Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; *for if the means be not in existence, the privilege itself would be lost, although no law for its suspension*

file original writs of habeas corpus still are filed, especially by prisoners, and its continued existence may be symbolic of the Supreme Court's role as the ultimate dispenser of justice in the federal system; between 1929 and 1961, 2,000 such motions were filed. Oaks, *supra* note 15, at 209–11. During the late 1950's and 1960's, the Court began treating the motion as a writ of certiorari. *Id.* at 201–06; *see, e. g.,* Carnley v. Cochran, 366 U.S. 958, 81 S.Ct. 1927, 6 L.Ed.2d 1253 (1961); Cheeks v. Maryland, 355 U.S. 929, 78 S.Ct. 415, 2 L.Ed.2d 413 (1958). The present Court apparently treats the motions as miscellaneous orders and denies them explicitly as motions for

leave to file petitions for writs of habeas corpus. *See* note 18 *infra.*

18. *See, e. g.,* Schwartz v. Nevada, 417 U.S. 906, 94 S.Ct. 2634, 41 L.Ed.2d 229 (1974); Black v. Attorney General, 416 U.S. 980, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974).

The exercise of original habeas corpus jurisdiction is extremely discretionary. *See, e. g.,* Ex parte Abernathy, 320 U.S. 219, 64 S.Ct. 13, 88 L.Ed. 3 (1943). 28 U.S.C. § 2241(b) empowers the Court to transfer the application to a district court with jurisdiction. The practice for the writ is governed by Supreme Court Rules 30 and 31.

*should be enacted.* Under the impression of this obligation, they give to all the courts the power of awarding writs of habeas corpus.

*Id.* at 95, 2 L.Ed. 554 (emphasis added). Hence, while it seems well-established that Congress, despite the suspension clause, possesses *some* control over habeas jurisdiction, *see, e. g.,* Craig v. Hecht, 263 U.S. 255, 271–73, 44 S.Ct. 103, 68 L.Ed. 293 (1923); Whitney v. Dick, 202 U.S. 132, 137, 26 S.Ct. 584, 50 L.Ed. 963 (1906), the question of whether Congress would violate the suspension clause by failing to grant power to issue the writ at all has been avoided.[19]

This brings us to the crux of appellant's suspension clause argument—once the privilege to issue the writ in the inferior article III courts has been granted, Congress may not, consistent with the suspension clause, dilute or remove it. Appellant's Br. at 42; *see* Respondent's Br. at 29, United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952) (Professor Freund). While conceding that the Supreme Court has not specifically endorsed this view, *see* Fay v. Noia, 372 U.S. 391, 406 n.15, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); United States v. Hayman, *supra,* 342 U.S. at 223, 72 S.Ct. 263, appellant contends that the Court has tacitly accepted it by requiring and then interpreting any attempted substitute to be "exactly commensurate" with the Great Writ.

The primary example is the Court's treatment of 28 U.S.C. § 2255 (1970), enacted in 1948 as a substitute for habeas corpus, and the statute upon which section 110 is based.[20] The Ninth Circuit held section 2255 to be an unconstitutional suspension of the writ. Hayman v. United States, 187 F.2d 456 (9th Cir. 1950). The Supreme Court disagreed and reversed because section 2255 was "intended to be as broad as habeas corpus" and simply "[afford] the same rights in another and more convenient forum." United States v. Hayman, *supra,* 342 U.S. at 217, 219, 72 S.Ct. at 271.[21] In subsequent cases the Court expanded upon this interpretation. In Sanders v. United States, 373 U.S. 1, 11–12, 83 S.Ct. 1068, 1076, 10 L.Ed.2d 148 (1963) (citations omitted), the Court, interpreting the successive petition bar of 28 U.S.C. § 2244 and § 2255, noted that "if construed to derogate from the traditional liberality of the writ of habeas corpus, § 2244 might raise serious constitutional questions", and that section 2255 was intended to provide "a remedy exactly commensurate with that which had previously been available by habeas corpus . . . ." *Id.* at 14, 83 S.Ct. at 1076, *quoting* Hill v. United States, 368 U.S. 424, 427, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962).

Palmore concludes that section 110 is not exactly commensurate to habeas corpus both because it is inadequate to pro-

---

**19.** Appellant adopts, without real objection by the Government, a variant of this point as the premise to his suspension argument—the suspension clause requires Congress to empower at least one federal court to grant the writ. For example, absent the inferior federal courts, this view would dictate that the Supreme Court be empowered to grant the writ. *See, e. g.,* Appellant's Br. at 40–45; Reply Br. at 28–32.

Another question is whether the suspension clause, coupled with the fact that the Supreme Court is explicitly established by the Constitution, dictates a conclusion that Congress must endow the Court with some sort of habeas corpus or, despite the suggestion in *Bollman,* that the Court possesses nonstatutory authority to issue the writ. *See* Appellant's Br. at 42 n.34; Respondent's Memorandum of Law at

10 n.8 ("Jurisdiction of federal courts (*except the Supreme Court*) to issue writs of habeas corpus is surely statutory"). Thus, the plain meaning interpretation of the statute divesting the Supreme Court for the first time in our history of some of its "original" habeas jurisdiction would force us to enter into treacherous constitutional territory indeed.

**20.** S.Rep.No.91–405, 91st Cong., 1st Sess. 38 (1969); H.R.Rep.No.91–907, 91st Cong., 2d Sess. 117 (1970); *see* part C *infra.*

**21.** The Court has subsequently stated that in *Hayman* it had "avoided the constitutional question by holding that § 2255 was as broad as habeas corpus." Sanders v. United States, 373 U.S. 1, 13, 83 S.Ct. 1068, 1076, 10 L.Ed.2d 148 (1963).

tect the interests which mandate ultimate article III review of questions involving constitutional liberty and because it entrusts that task to judges who do not possess the tenure and salary protections which lie at the heart of the independence of the federal judiciary. Appellant opines that in our constitutional system ultimate protection of our constitutional liberties is entrusted to article III judges. Habeas jurisdiction in the inferior federal courts discharges that function and also serves to produce uniform constitutional interpretation between local and federal courts. Moreover, argues Palmore, article III judges were made the final arbiters of the Constitution because of their preferred position of detachment and freedom from local pressures and considerations, *see* Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), guaranteed by the article III salary and tenure provisions, which judges of the District of Columbia courts do not possess. Hence, section 110 is not an exactly commensurate remedy and represents an unconstitutional suspension of the writ.

The Government responds by emphasizing Congress' authority to control the jurisdiction of the federal courts and defends section 110 as a constitutional exercise of that congressional authority. It contests the assertion that Congress, once having vested the inferior article III courts with habeas jurisdiction, may not reduce it. Moreover, the Government contends that the principle to be derived from Brown v. Allen, *supra*, is a need for *federal* review of constitutional claims and that section 110, creating a remedy in what the Government repeatedly characterizes as a *"federal court,"* meets that need; it rejects the suggestion that the *Brown* Court attached importance to the institutional

protections accorded article III judges by referring to commentators who have judged that factor to be of only "limited" significance. Gov't. Br. at 31, *incorporating* Gov't. Pressley Br. at 31; *see* Developments in the Law—Habeas Corpus, 83 Harv.L.Rev. 1038, 1060 (1970).[22] In addition, the Government asserts that *Palmore* mandates the rejection of appellant's argument concerning the importance of the tenure and salary provisions, emphasizing that Congress also took precautions to ensure the independence of the Superior Court judges. Gov't. Pressley Br. at 39 n.32, 41–43. Finally, the Government claims that the uniformity argument must be rejected since the Supreme Court stands ready by writ of certiorari to resolve potential conflicts between the two court systems.[23] *Id.* at 35–37.

■ What emerges from these conflicting positions is the absence of a clear or simple resolution. We are not as confident as the Government of the controlling nature of the Supreme Court's *Palmore* decision. While the Court rejected the salary and tenure argument in upholding trial of District of Columbia Code offenses in Superior Court, it noted that "Palmore was no more disadvantaged and no more entitled to an Art. III judge than any other citizen of any of the 50 States who is tried for a strictly local crime," and explicitly stated "[w]e do not discount the importance attached to the tenure and salary provisions of Art. III . . .." 411 U.S. at 410, 93 S.Ct. at 1682. Because of procedural and institutional limitations, reliance upon Supreme Court discretionary review as the sole protection of important interests may be both inadequate and impracticable. *See* Brown v. Allen, *supra*, 344 U.S. at 489–97, 73 S.Ct. 397;

---

**22.** The Government points out that while a forum for a "second and removed hearing" for a review of constitutional claims may well be necessary, it may be in the same court, referring to the section 2255 analogy. Gov't. Pressley Br. at 34.

**23.** The Government also asserts that even if we "should conclude that the Constitution requires review by an Article III court of a petitioner's constitutional claim raised on collateral attack, . . . the appellate review available in the Supreme Court on a writ of certiorari should satisfy such a requirement." *Id.* at 43.

Freund, Symposium—Habeas Corpus, Proposals for Reform, 9 Utah L.Rev. 18, 27–28 (1964). Finally, while the Superior Court is undeniably a federal court in the sense it was *created* by Congress, it is not a federal court as *defined* by Congress in the Court Reform Act; [24] the significance, if any, of the distinction would have to be discerned.

However, adoption of appellant's argument would require recognition as constitutionally overriding of factors, the importance of which have only been hinted at previously. It would also demand delineating for the first time the boundaries of congressional control over federal jurisdiction *vis-a-vis* the suspension clause. Both parties recognize the unresolved nature of this question. Palmore concedes "the full meaning of the constitutional guarantee against the writ's suspension has never been fully explored," Appellant's Br. at 40; the Government "acknowledge[s] that this question is one of the first impression." Gov't. Pressley Br. at 30. In fact, one commentator has noted: "The suspension clause, so simple in appearance, is fraught with confusion. Those few cases which have dealt with it provide little interpretative guidance." Developements, *supra*, 83 Harv.L.Rev. at 1263.

This difficult question, along with the equal protection problem to which we now turn, is a significant "variable" which compels us to reject the Government's "clear meaning" approach to the statute. *See* United States v. Universal C.I.T. Credit Corp., *supra.*

2. *Equal Protection*

Palmore's equal protection argument is straightforward. Since 28 U.S.C. §§ 2241 *et seq.* apply to every person in custody either by authority of the United States or in violation of the Constitution, laws, or treaties of the United States, then, if the district court's interpretation of section 110(g) is upheld, the statute would deny prisoners convicted in the Superior Court equal protection as guaranteed by the due process clause of the fifth amendment. *See* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Appellant places significant reliance upon our decision in United States v. Thompson, *supra*, 452 F.2d at 1338–41, where we found that 23 D.C.Code § 1325, if construed to be applicable to individuals convicted of federal crimes in district court, would deny them equal protection by treating prisoners in the District differently than those in every other district court whose motions for release pending appeal would be judged under the more lenient standards of the Bail Reform Act, 18 U.S.C. § 3148 (1970). *See also* United States v. Hairston, 161 U.S.App.D.C. 466, 495 F.2d 1046 (1974); United States v. Henson, 159 U.S.App.D.C. 32, 486 F.2d 1292 (1973) (en banc); United States v. Brown, 157 U.S.App.D.C. 311, 483 F.2d 1314 (1973).

In response, the Government again points to Congress' broad power to legislate for the District of Columbia under article I, section 8, clause 17 and to the unique position of the District in our federal system. It also challenges the "fundamentalness" of the right appellant advances—collateral review in an article III court. It notes that Congress may draw distinctions among citizens so long as there is sufficient justification for the distinction and argues that the justification "virtually cries out from the legislative history of the Court Reorganization Act," the criminal backlog in the district court and the " 'crisis' of crime 'gripping' the city." [25] Finally, the Government attempts to distinguish the *Thompson* case by three methods. First, it argues that unlike appellant, Thompson stood convicted of federal offenses; second, it dis-

---

**24.** The article III courts are defined as federal courts. The Superior Court and District of Columbia Court of Appeals are defined as District of Columbia courts. 11 D.C.Code § 101(1) (1973).

**25.** *See* Gov't. Pressley Br. at 46, *citing* H.R. Rep.No.91–907, *supra* note 20, at 25–27, 226; S.Rep.No.91–405, *supra* note 20, at 2–3.

putes *Thompson's* premise that "Congress cannot constitutionally create standards of treatment to be applied in the District of Columbia which differ from those applicable elsewhere" because the premise "seriously undermines and restricts the traditional plenary power of Congress under the Constitution 'to exercise exclusive Legislation in all Cases whatsoever' for the District of Columbia;"[26] and finally, it argues this case differs from *Thompson* because adoption of "appellant's argument threatens to destroy the constitutionally mandated powers of the legislative branch to serve as a check and balance on the judicial branch by controlling the latter's jurisdiction."[27]

The difficulty with Palmore's argument is to ascertain exactly what right the classification affects and what interest the Government must advance to justify the distinction. We have recognized "[t]he rights of a criminal defendant are in some sense the most basic of all, since what is at stake is no less than the freedom to be free." United States v. Thompson, *supra*, 452 F.2d at 1340. However, the alleged right that appellant is attempting to protect may be precisely defined as the guarantee to have his claim heard in an article III court. As noted *supra*, the existence and extent of this right have never been fully delineated. Also unresolved is the question whether the Government must only demonstrate a rational basis for the classification, *see* Dandrige v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491

(1970); Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911), or if the right be deemed fundamental, a compelling interest. *See* Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); United States v. Thompson, *supra*.

■ Despite these difficulties, we do not believe that appellant's argument can be disposed of as neatly as the Government purports. We are certainly aware of the *sui generis* position of the District of Columbia, see, e. g., District of Columbia v. Carter, 409 U.S. 418, 432, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), and of Congress' extensive power to legislate for the District[28] and to control the jurisdiction of the court systems it creates. However, Congress may not exercise its power, whether explicitly or implicitly derived from the Constitution, in a manner inconsistent with the limitations on government power contained elsewhere in that document. The *sui generis* nature of the District and Congress' legislative authority are not talismans which make appellant's equal protection argument disappear. *See* United States v. Thompson, *supra*, 452 F.2d at 1338.

■ Moreover, while the overriding legislative purpose of the Court Reform Act seems clear—the reorganization of the administration of criminal justice in the District to help alleviate "soaring" crime rates—it is not so clear that section 110(g) is a means sufficiently related to the achievement of that legislative end to be constitutional. If the court

26. Gov't. Pressley Br. at 47–48. The Government further attempts to undercut the *Thompson* premise by asserting that it is in direct conflict with our previous decision in Sims v. Rives, 68 U.S.App.D.C. 24, 84 F.2d 871, cert. denied, 298 U.S. 682, 56 S.Ct. 960, 80 L.Ed. 1402 (1936), which held that equal protection as applied to the District of Columbia meant only that all persons within the District must be treated alike. However, the *Thompson* division distinguished and limited *Sims* to its facts, and hence that case can no longer be invoked for such a broad, general proposition. Moreover, assuming *arguendo* the validity of the principle the Government advances, there

still exists a difficult equal protection problem concerning a classification of persons within the District. *See* notes 30–31 *infra* and accompanying text.

27. Gov't. Pressley Br. at 50.

28. It is apparent that the power of Congress under clause 17 permits it to legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under art. I, § 8. Palmore v. United States, *supra*, 411 U.S. at 397–98, 93 S.Ct. 1670.

reforms were "calculated to restore the spectre of certain justice, [and] the deterrent impact of speedy disposition," [29] that interest may have been fully effectuated by the transfer of *trial* jurisdiction to the Superior Court. The relation to the identified interest of divesting the district court of its habeas jurisdiction appears more tenuous.

Even if we accepted the classification of treating District prisoners differently as related to a legitimate legislative goal, there is a similar second classification involving prisoners *within* the District which poses equal protection problems. Section 110(g), under the Government's theory, only divests the district court of jurisdiction to hear post-conviction writs; pre-trial petitions remain unaffected. Clearly the legislative end of prompt criminal disposition cannot justify this distinction.[30] Indeed, we are uncertain whether *any* rational justification could be advanced for this classification.[31]

Thus, what emerges from this discussion is that the district court's interpretation of section 110(g) raises serious questions about the statute's constitutionality. We have noted that "the presumption of the constitutional validity of legislation enacted by Congress raises a corollary presumption that constructions calling statutes into serious constitutional question are erroneous and, in any event, are to be avoided whenever possible." United States v. Hairston, *supra*, 495 F.2d at 1052; *see* note 8 *supra*. Of course, if Congress clearly intended the construction which raises these questions of first impression, they may not be avoided. *See* United States v. Thomp-

son, *supra*. However, to ascertain that congressional intent, we cannot don the interpretive "blinders" the Government offers, but must construe the statute only after reference to the legislative history behind it and behind the entire Act. We now turn to that inquiry.

### C

The legislative history concerning section 110 is sparse. The Senate Committee Report stated:

> *Section 23–110* is new. Rather than relying on the inherent power of the superior court to review judgments of conviction, the new section provides statutory procedures for post-conviction challenges. Section 23–110 is modeled upon 28 U.S.C. section 2255 with only the necessary technical changes.

S.Rep.No.91–405, 91st Cong., 1st Sess. 38 (1969); *see* H.R.Rep.No.91–907, 91st Cong., 2d Sess. 117 (1970). Nowhere in the committee reports, nor in the congressional floor debates is there an explicit reference or even a suggestion that section 110 was to have the jurisdictional impact that the district court accorded it. In contrast, the existing brief legislative history indicates a different, but clear and logical, legislative purpose behind section 110.

Section 110 is "modeled upon 28 U.S.C. section 2255," which was enacted in 1948 for reasons that have been fully explored in previous court opinions, e. g., Hill v. United States, *supra*, 368 U.S. at 427–28, 82 S.Ct. at 471–72; United States v. Hayman, *supra*, 342 U.S. at 210–224, 72 S.Ct. 263, and need only be summarized here. Before 1948 post-conviction petitions for habeas corpus were

---

**29.** Statement of the Managers on the Part of the Senate Submitted Regarding the Conference Action Upon S. 2601, the President's Crime Legislation for the District of Columbia, 91st Cong., 2d Sess. 2 (1970).

**30.** This argument is *not* the equivalent of a potential claim brought by a federal post-conviction prisoner challenging 28 U.S.C. § 2255. The above complaint is not directed at venue or at the type of remedy available (since sec-

tion 2255 has been held to be the equivalent of habeas corpus) but at the nature and characteristics of the forum available to hear the complaint.

**31.** It is perhaps significant that at the time this legislation was enacted, the *Younger v. Harris* line of cases did not exist, and the controlling law was Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) and its progeny.

normally filed in the district where the prisoner was confined, and hence the five districts where federal prisons were located received the bulk of these cases. 342 U.S. at 213–14 & n.18, 72 S.Ct. 263, *citing* Speck, Statistics on Federal Habeas Corpus, 10 Ohio St.L.J. 337 (1949).[32] In response to this problem and after receiving the recommendation of the Judicial Conference of the United States, Congress eventually enacted 28 U.S.C. § 2255, authorizing a new remedy in the sentencing court "intended to be as broad as habeas corpus." *Id.* at 213–17, 72 S.Ct. at 271. The statute has been construed to be exactly commensurate with the Great Writ, and its principal effect has been to act as an equalizing venue provision for post-conviction pleas for collateral relief.[33]

In 1949, section 2255 was amended to apply to any "court established by Act of Congress," 63 Stat. 105 (1949), primarily to include within its scope the federal territorial courts. *See* United States ex rel. Leguillou v. Davis, 212 F.2d 681 (3rd Cir. 1954). However, while the local District of Columbia courts were generically courts created by "Act of Congress," the Municipal Court of Appeals held in Burke v. United States, 103 A.2d 347 (D.C.Mun.App.1954) and Ingols v. District of Columbia, 103 A.2d 879 (D.C. Mun.App.1954) that they did not fall within the statute. Notably, *Burke* and *Ingols* did provide a collateral remedy by holding that the local courts had inherent common law power to entertain a motion to vacate a sentence. *Id.* at 880; 103 A.2d at 350–51.

From this discussion and the fact that the Senate Report tracks the language of the *Burke* and *Ingols* opinions, the one explicit legislative intent behind section 110 becomes clear; rather than leaving the new local courts to rely once again upon their inherent authority, Congress provided a detailed statutory remedy. Quite naturally, as a model, Congress drew upon the statutory remedy previously created for the federal courts to alleviate a different problem.[34]

In sum, the district court construed a statute which *created* a statutory remedy for post-conviction relief in the new court system as *eliminating* by implication a remedy which the inferior article III courts and the Supreme Court have exercised for two hundred years. Of course, repeals by implication, especially of jurisdictional statutes, are disfavored. *See, e. g.,* Lynch v. Household Finance Corp., 405 U.S. 538, 549, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). As the Court recently stated, "this canon of construction applies with particular force when the asserted repealer would remove a remedy otherwise available." Schlesinger v. Councilman, —— U.S. ——, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). Nevertheless, the Government argues the intent to repeal jurisdiction is evidenced by the "only necessary technical changes" language in the committee reports: "[t]he 'necessary technical changes' referred to in the legislative history were those changes 'necessary' to insure that a collateral attack on a conviction in the Superior Court could be entertained only in that court. . . ."

---

**32.** The housekeeping problem was exacerbated by the fact that the records of the sentencing court, which could be a great aid in disposing of the petition, were not readily available to the habeas corpus court. United States v. Hayman, *supra,* 342 U.S. at 212–13, 72 S.Ct. 263.

**33.** The Government disputes the characterization of the net effect of section 2255 as to be a venue provision. *See* Gov't. Br. at 17 n.14. Its argument appears undercut by the Supreme Court's constant reminder that section 2255 must be treated as *exactly commensurate* with the Great Writ. *See also* Kaufman v.

United States, 394 U.S. 217, 221, 89 S.Ct. 1068, 1071, 22 L.Ed.2d 227 (1969) ("Section 2255 revised the procedure . . . but did not in any respect cut back the scope of the writ").

**34.** The Superior Court does not have a problem of disproportionate allocation of petitions between courts such as the federal one which prompted section 2255.

As the Government has noted, Congress had before it extensive jurisprudence concerning section 2255 and thus knew it was using as a model an effective, "exactly commensurate" remedy.

Gov't. Br. at 24. That this argument is advanced by a party who is imploring us to adopt a plain meaning approach to the statute may strain credulity. We reject the assertion that the alleged jurisdictional effects can be described as merely technical changes, and conclude that no support for the district court's interpretation can be found in the legislative history behind section 110.[35]

Several other indicia of congressional intent add credence to appellant's contention that Congress did not intend section 110(g) to affect the jurisdiction of the article III courts. First, as part of the reorganization generated by the Court Reform Act, Congress amended title 28 of the United States Code to bring that title, Judiciary and Judicial Procedure, into conformity with the new court system. Congress added 28 U.S.C. § 292(c) to provide for temporary assignment of district court judges to serve as judges of the Superior Court; amended 28 U.S.C. § 1257 to include the District of Columbia Court of Appeals within the term "highest court of a State" for purposes of rules of review to the Supreme Court by appeal or certiorari; and amended 28 U.S.C. § 1869(b) to include the Superior Court within the scope of the term "district court" for purposes of parts of the Federal Jury Act.[36] In contrast, 28 U.S.C. § 2241 was not amended to reflect the partial divesture of jurisdiction allegedly enacted in section 110(g).[37] While certainly not dispositive,[38] we believe this is further evidence that Congress never intended to affect the federal courts' jurisdiction, especially in light of the evident care with which Congress legislated and the ease with which an express amendment could have been effectuated. *Cf.* Palmore v. United States, *supra,* 411 U.S. at 395, 93 S.Ct. 1670.

Perhaps a more significant indicium is the obvious relationship between section 110 and a strong legislative purpose of the Court Reform Act, apparent from both the face of the Act and its legislative history—the establishment of a dual court system analogous to the relationship between the federal and state courts. This reorganization goal is abundantly clear in the legislative histo-

**35.** Our rejection of the Government's interpretation of this language is buttressed by the lack of debate over its effect and constitutionality. *See* notes 41–43 *infra* and accompanying text.

We also note that the commentators have split on the question before us. *Compare* Rauh & Silbert, Criminal Law and Procedure: D.C. Court Reform and Criminal Procedure Act of 1970, 20 Am.U.L.Rev. 252 (1971) *and* Williams, District of Columbia Court Reorganization, 1970, 59 Geo.L.J. 477 (1971) *with* Smalls, Habeas Corpus in the District of Columbia, 24 Cath. U.L.Rev. 75 (1974).

**36.** Section 172 also added 28 U.S.C. § 1451 to include the District of Columbia Courts within the provision for removal of cases from state courts and 28 U.S.C. § 1363 to exclude laws applicable exclusively to the District of Columbia from the chapter on district court jurisdiction and amended 28 U.S.C. § 2113 to include the District of Columbia Court of Appeals within the terms "state court", "State Courts", and "highest court of a State" for purposes of the chapter on procedural provisions concerning Supreme Court review.

**37.** Such an amendment would not be unreasonable for as matters now rest, an alleged modification to jurisdiction codified in the United States Code is only codified in the District of Columbia Code.

**38.** The Government offers two arguments which it contends undercuts the significance of this. First, the Government notes that when Congress enacted section 2255, it failed to amend the newly consolidated section 2241 to reflect the new remedy. Gov't. Pressley Br. at 14–15. However, section 2255 was itself an amendment to and included in the habeas chapter of title 28.

Second, the Government asserts that when Congress amended 16 D.C.Code § 1901, it did not amend 28 U.S.C. § 2241 despite the fact "[t]here is no question that [section 1901] also acted to restrict the normal habeas corpus jurisdiction of the District Court." *Id.* at 15. Contrary to the Government's opinion, we have held that section 1901 does not affect the normal jurisdiction of the district court here. McCall v. Swain, 166 U.S.App.D.C. 214, 510 F.2d 167, 177 (1975).

In sum, we do not find that either of the Government's arguments undercut the point advanced above, which in conjunction with the other legislative history we discuss, dictate the result we reach.

ry. The Senate Committee Report states:

> This transfer [of jurisdiction to the Superior Court] will bring the jurisdiction of the U.S. courts in the District of Columbia in line with the jurisdiction exercised by the Federal courts in the several States, and will give the local courts jurisdiction over all purely local matters.

S.Rep.No.91–405, *supra,* at 5. The House Report similarly notes:

> Upon completion of the three stages of transfer of jurisdiction the United States District Court for the District of Columbia will be on a par with other United States district courts, exercising federal jurisdiction only, and the Superior Court of the District of Columbia will have all purely local jurisdiction.
>
> . . . . .
>
> The jurisdictional changes . . . will result in a Federal-State court system in the District of Columbia analogous to court systems in the several States.

H.R.Rep.No.91–907, *supra,* at 34–35.

In cases dealing with the Court Reform Act and the District, the courts have recognized this legislative purpose. The Supreme Court has repeatedly invoked the federal-state analogy, *see* Pernell v. Southall Realty, *supra,* 416 U.S. at 367, 94 S.Ct. 1723; Palmore v. United States, *supra,* 411 U.S. at 408–09, 93 S.Ct. at 1681–82, and this court has noted that the "overriding purpose which emerges from the Act is to put the District's judicial system on a par with those of the states." United States v. Thompson, *supra,* 452 F.2d at 1342.

The interpretation of section 110 most harmonious with this federal-state analo-gy is clearly appellant's, which would allow the district court to entertain petitions for collateral review in the same manner as district courts do for the fifty states. In fact, it would not be inaccurate to state that the district court's holding is flatly inconsistent with this congressional purpose. Nowhere is there any indication that the federal-state analogy was subject to certain jurisdictional exceptions or that the district court here would possess less jurisdiction than in other districts.[39] In fact, 11 D.C. Code § 501 (1973) defines the civil jurisdiction of the district court, which includes habeas corpus, by initially stating that "[i]n addition to its jurisdiction as a United States district court." The only construction of section 110 consistent with this analogy is that Congress never intended to affect the district court's habeas jurisdiction.

To blunt this conclusion, the Government maintains that section 110(g) effectuates another, even more overriding, function of court reform, the elimination of jurisdiction over local matters in order to help alleviate the soaring District crime rate through swifter justice. In this regard, section 110 implements this purpose by "eliminat[ing] from the caseload of the District Court the large number of habeas corpus petitions that could potentially be brought by those convicted in the Superior Court and provid[ing] an alternative forum for the resolution of these claims." Gov't. Br. at 29. We disagree; these congressional purposes do not dictate the result the Government suggests, nor do we believe that to construe the statute as not affecting federal jurisdiction is inconsistent with these purposes.

---

**39.** The Government argues that the legislative history reveals "that the United States District Court for the District of Columbia would no longer be burdened with so much business of a purely local nature, *not that the court would henceforth have precisely the same jurisdiction.*" Gov't. Br. at 29 (emphasis added). We must reject this latter suggestion because we believe it flies in the face of clear legislative history and consistent contrary court interpre-tations. In fact, we are surprised that the Government seriously advances it when it even quotes from the Senate Conference Managers:

> the Federal district court for the District of Columbia is to regain its rightful status as a Federal tribunal, devoted on a fulltime basis to Federal business, like all other United States district courts.

Statement, *supra* note 29, at 5.

Certainly a primary purpose of the Court Reform Act was to remove local matters from the federal courts, especially the trial of local crimes. As the House Report states, "[t]he fundamental reason for reorganization of the District of Columbia courts is the soaring crime rate." H.R.Rep.No.91–907, *supra*, at 25. The Senate Committee Report notes the anomaly "inherent in burdening a Federal district court with sole general jurisdiction over the full panoply of local legal matters. The burden is acute in the District of Columbia, the seat of the Federal Government, where . . . a substantial and greater quantum of genuinely Federal litigation might best and conveniently be brought." S.Rep.No.91–405, *supra,* at 3. Perhaps the best explication of what Congress was attempting to accomplish was Justice White's in *Palmore*:

> Congress had concluded that there was a crisis in the judicial system of the District of Columbia, that case loads had become unmanageable, and that neither those matters of national concern nor those of strictly local cognizance were being promptly tried and disposed of by the existing court system. The remedy in part, was to relieve the regular Art. III courts, that is, the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit, from the smothering responsibility for the great mass of litigation, civil and criminal, that inevitably characterizes the court system in a major city and to confine the work of those courts to that which, for the most part, they were designed to do, namely, to try cases arising under the Constitution and the nationally applicable laws of Congress. The other part of the remedy, equally essential, was to establish an entirely new

court system with functions essentially similar to those of the local courts found in the 50 states of the Union with responsibility for trying and deciding those distinctively local controversies that arise under local law including local criminal laws having little, if any, impact beyond the local jurisdiction.

411 U.S. at 408–09, 93 S.Ct. at 1682.

We think that this Congressional purpose has been fully carried out by the transfer of jurisdiction over local crimes to Superior Court. *See, e. g., Washington Post,* Apr. 20, § B, p. 1, col. 7. The transfer of trial jurisdiction effectuates the goal of swift justice; the question of post-collateral relief does not affect that process at all.[40] More importantly, the fourth amendment claim appellant advances is not a "purely local matter;" it is a case arising under the Constitution, a matter to which our citizens have always had recourse to the article III courts. Congress, in delineating the purposes behind Court Reform, carefully distinguished between "local" and "federal" business, and appellant's construction of section 110 is harmonious with that congressional scheme.

We find one final indicium of legislative intent. As we have seen, the legislative history contains no debate or discussion of section 110's considerable jurisdictional impact or its possible unconstitutionality. In contrast, proposals in recent years which would affect the habeas jurisdiction of the federal courts have sparked considerable debate and controversy concerning both their desirability and constitutionality.

In 1968, Congress had before it, as part of a crime control act, a proposed statute, the intended effect of which was to eliminate post-conviction federal habeas relief for state prisoners.[41] The ex-

---

**40.** This conclusion is reinforced by the fact that all parties concede that Congress did not divest the district court's authority to entertain pre-trial writs.

**41.** *See* 114 Cong.Rec. 11186 (1968). Section 702 of the bill, which would have added to title

28 of the United States Code, section 2256 to read:

> The judgment of a court of a State upon a plea or verdict of guilty in a criminal action shall be conclusive with respect to all questions of law or fact which were determined, or which could have been determined, in

tensively debated proposal was opposed upon constitutional grounds,[42] and apparently was dropped for that reason. *See* 119 Cong.Rec. 2221 (1973) (Remarks of Sen. Hruska). In 1973, another bill was introduced affecting federal habeas jurisdiction. *See* S. 567, 93rd Cong., 1st Sess. (1973). *See generally* Note, Proposed Modification of Federal Habeas Corpus for State Prisoners—Reform or Revocation? 61 Geo.L.J. 1221 (1973). Once again, the constitutional considerations were extensively set out.[43]

 We find the congressional silence, when contrasted with the extended constitutional debates over other proposals, both "curious"[44] and significant. While these other proposals would have affected more prisoners than section 110, the district court's interpretation of that statute more completely eliminated article III review of District prisoners' claims. The most logical inference which may be drawn from this silence is

that Congress never intended section 110 to affect the district court's jurisdiction.

We have failed to discern even a glimmer of legislative history to support the view that Congress intended to effectuate a substantial reduction in jurisdiction and to take us to the constitutional frontiers which have heretofore remained, perhaps deliberately, undefined. In *Brown v. Allen, supra,* the Supreme Court rejected a contention that Congress intended 28 U.S.C. § 2254 to eliminate the right of a state prisoner to apply for habeas relief in the lower federal courts, stating: "We are unwilling to conclude without a definite congressional direction that so radical a change was intended." 344 U.S. at 450, 73 S.Ct. at 404. As the Court said in another situation:

> We are asked to conclude that Congress, . . . without a suggestion as to the effect, or a word of debate as to the desirability, of so fundamental a

---

that action until such judgment is reversed, vacated, or modified by a court having jurisdiction to review by appeal or certiorari such judgment; and neither the Supreme Court nor any inferior court ordained and established by Congress under article III of the Constitution of the United States shall have jurisdiction to reverse, vacate, or modify any such judgment of a State court except upon appeal from, or writ of certiorari granted to review, a determination made with respect to such judgment upon review thereof by the highest court of the State having jurisdiction to review such judgment. *Id.* at 11189.

**42.** Senator Joseph Tydings, a leading opponent of the bill, solicited and introduced the views of 212 legal scholars from 43 law schools on the constitutional issues involved. *See* 114 Cong.Rec. 13850–13867 (1968). Senator Tydings delivered an extensive speech on the Senate floor on those issues, and was engaged in debate specifically focusing on the proposal's constitutional vitality. Id. at 13990–97. *See also id.* at 14136–37. Perhaps the most adamant constitutional viewpoint advanced was Minority Leader Scott's:

> if Congress tampers with the great writ, its action would have about as much chance of being held constitutional as the celebrated celluloid dog chasing the asbestos cat through hell.
> *Id.* at 14183.

It is noteworthy that Senator Tydings, a leading constitutional opponent of the proposed 1968 changes, was a prime advocate for the Court Reform Act, serving as Chairman of the Senate Committee on the District of Columbia and presiding at hearings which eventually lead to the Act. Hearings on § 1066 Before the Senate Comm. on the District of Columbia and the Senate Subcomm. of the Comm. on the Judiciary, 91st Cong., 1st Sess., pt. 3 at ii, 467 (1969).

**43.** *See* 119 Cong.Rec. 2220–2247 (1973). The bill would have limited federal post-conviction review to cases involving a claimed constitutional violation which "presents a substantial question," which was not and could not be raised in a state proceeding, which "has as its primary purpose the protection of the reliability of . . . the fact finding process," and which probably would have produced a different result if the violation had not occurred. Section 2255 would have been similarly amended. *Id.* at 2222.

**44.** "Is there any point to which you would wish to draw my attention?"

> "To the curious incident of the dog in the night-time,"
> "The dog did nothing in the night-time."
> "That was the curious incident," remarked Sherlock Holmes.

A. Doyle, *Silver Blaze, The Complete Sherlock Holmes,* 347 (1930).

change, nevertheless, by failing to alter the identifying words of [the operative statute], . . . has radically modified a statute always theretofore maintained and considered as of great importance. It is inconceivable that a rule in force from the beginning of the government, a part of our history as well as our law, welded into the structure of our national polity by a century of legislative and administrative acts and judicial decisions, would have been deprived of its force in such dubious and casual fashion.

Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 68, 67 L.Ed. 199 (1922). We endorse those sentiments here.

D

■ There is one remaining indication that we are on firm ground in our approach to the statute: the Supreme Court's treatment of cases which raised the spectre that recourse through habeas corpus to the article III courts to test the legality of detention would not be available. In each case, the Court has rejected such a construction of the relevant statute. We have already noted the Court's refusal to accept an interpretation of 28 U.S.C. § 2254 which would have permanently consigned constitutional claims of state prisoners to the state courts, see Brown v. Allen, supra and its avoidance of the problem for 28

U.S.C. § 2255 by holding that section to be exactly commensurate to habeas corpus. See Sanders v. United States, supra; United States v. Hayman, supra. Another example of the Court's approach is its treatment of the immigration laws. Time and again, the Court faced statutes which made executive determinations final, did not provide for judicial review, and could be construed to repeal the federal court's habeas jurisdiction.[45] In every case, the Court found jurisdiction. See The Japanese Immigrant Case, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903);[46] United States v. Jung Ah Lung, 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888).[47] See also Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908).

Perhaps the most relevant analogy involves the military justice system, created, like the local District of Columbia courts, pursuant to Congress' article I powers. The inferior article III courts traditionally have had habeas jurisdiction over persons detained by authority of the military justice system. See, e. g., Ex parte Reed, 100 U.S. 13, 25 L.Ed. 538 (1879). In 1948, Congress enacted a collateral attack remedy within the military justice system itself. 62 Stat. 639 (1948). The statute stated that these collateral attack proceedings were "final and conclusive" and "binding upon all departments, courts, agencies, and officers of

---

**45.** See Act of May 6, 1882, 22 Stat. 58, as amended, Act of July 5, 1884, 23 Stat. 115. See also Act of March 3, 1891, 26 Stat. 1085:

All decisions made by the inspection Officers or their assistants touching the right of any alien to land, when adverse to such right, *shall be final* unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury.

(emphasis added); 28 Stat. 390 (1894):

In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, *shall be final*, unless reversed on appeal to the Secretary of the Treasury.

(Emphasis added).

**46.** In this case, the Court noted: "An act of Congress must be taken to be constitutional unless the contrary plainly and palpably appears. The words here used do not require an interpretation that would invest executive or administrative officers with . . . absolute and arbitrary power . . . ." The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 615, 47 L.Ed. 721 (1903).

**47.** In this case, it was argued that the right to issue the writ "was taken away by the Chinese restriction act, which regulated the entire subject-matter, and was necessarily exclusive." United States v. Jung Ah Lung, 124 U.S. at 626, 8 S.Ct. at 666. The Court, however, concluded: "We see nothing in these acts which in any manner affects the jurisdiction of the courts of the United States to issue a writ of *habeas corpus*." *Id.* at 628–29, 8 S.Ct. at 666.

*the United States.*" This provision, as easily as section 110(g), could be read to preclude further resort to the article III courts. However, faced with this construction and the complementary argument that it resulted in suspension of the Writ, the Court in Gusik v. Schilder unanimously held:

> We read the finality clause . . . as doing no more than describing the terminal point for proceedings within the court-martial system. If Congress had intended to deprive the civil courts of their habeas corpus jurisdiction, which has been exercised from the beginning, the break with history would have been so marked that we believe the purpose would have been made plain and unmistakable. The finality language so adequately serves the more restricted purpose [of exhaustion] that we would have to give a strained construction in order to stir the constitutional issue that is tendered.

340 U.S. 128, 132–33, 71 S.Ct. 149, 152, 95 L.Ed. 146 (1950) (footnote omitted). This language is equally applicable here.

### E

■ In light of our analysis in this part of the opinion, we reject the district court's and the Government's construction of section 110 as unsupported by the specific legislative intent behind the section and the general purposes behind the Court Reform Act. Recognizing that courts should interpret statutes to avoid difficult constitutional questions and that the constitutional questions raised are both novel and difficult, and that the Supreme Court has repeatedly avoided this problem by construing statutes not to affect jurisdiction, we find that Congress never intended to, nor does section 110 actually, affect the district court's jurisdiction to entertain post-conviction habeas petitions from local prisoners. Instead, we hold that section 110(g) is an exhaustion of remedies statute, requiring initial submission of claims to the local courts and marking, as did the statute in *Gusik*, the terminal point for proceedings

in the local court system. This construction is consistent with the statute, the state court analogy for the Superior Court, *see* 28 U.S.C. § 2254(b), (c) (1970); Fay v. Noia, *supra*, 372 U.S. at 418–20, 83 S.Ct. 822, and federal habeas review of custody imposed by article I courts. *See* Noyd v. Bond, 395 U.S. 683, 693–94, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969); Gusik v. Schilder, *supra*, 340 U.S. at 131–32, 71 S.Ct. 149.

### III

Having determined that the district court may entertain petitions brought by prisoners convicted in Superior Court, the question still remains whether appellant properly may maintain his petition at this time. We hold that Palmore properly invoked jurisdiction under 28 U.S.C. § 2241(c)(3) and has sufficiently exhausted his local remedies to maintain his petition.

28 U.S.C. § 2241(c) reads in part:

> The writ of habeas corpus shall not extend to a prisoner unless—
>
> . . . . .
>
> (3) He is in custody in violation of the Constitution or laws or treaties of the United States;
>
> . . . . .

■ Palmore is released on bail, *see* note 3 *supra*, which constitutes custody within the meaning of section 2241. *See* Hensley v. Municipal Court, 411 U.S. 345, 348–53, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); United States ex rel. Russo v. Superior Court, 483 F.2d 7, 12 (3d Cir.), cert. denied, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). His application for the writ alleged, *inter alia*, that he is in custody in violation of the fourth amendment of the Constitution, a recognized basis for collateral relief. 28 U.S.C. § 2241(c) (1970); Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969).

■ The final issue is whether appellant has exhausted his local remedies as required by section 110(g). Toward

that end, we may usefully draw upon the principles of comity which have emerged from the exhaustion of state remedies requirement, now codified in 28 U.S.C. § 2254.[48] Applying these principles, we think that Palmore has sufficiently exhausted his local remedies despite not having made a motion under section 110. The fourth amendment issue was fully tendered to the Superior Court and the District of Columbia Court of Appeals; those courts fully considered and rejected the claim. The exhaustion requirement does not require prisoners to make futile gestures. "[O]nce the federal claim has been fairly presented to the [local] courts, the exhaustion requirement is satisfied." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); see Francisco v. Gathright, 419 U.S. 59, 63, 95 S.Ct. 257, 42 L.Ed.2d 226 (1974); Wilwording v. Swenson, 404 U.S. 249, 250, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Roberts v. LaVallee, 389 U.S. 40, 42–43, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); Brown v. Allen, *supra*, 344 U.S. at 447–50, 73 S.Ct. 397. Thus, appellant's application for the writ is timely, and he is entitled to consideration on the merits by the district court.[49]

In conclusion, we emphasize what we do and do not hold today. We hold that section 110(g) does not affect article III habeas jurisdiction. We do so after concluding that Congress never intended that result; if our interpretation is erroneous, Congress stands available to enlarge upon or clarify the statute. *See* Border Pipe Line Co. v. FPC, 84 U.S. App.D.C. 142, 171 F.2d 149 (1948). We reach no decision on the constitutional issues raised here; while their substantiality affected our consideration of the statute, demarcation of the extent of the constitutional restraints that the equal protection guarantee and the suspension clause impose upon Congress' power to allocate jurisdiction must await the day Congress more explicitly asserts that power.

■ Lastly, we do not believe that our decision thrusts the federal courts into a supervisory role over the local courts of the District of Columbia, nor does it upset the reorganization Congress established in the Court Reform Act. All claims must be presented in the first instance to the local courts. Those judges, who also swear to uphold the Constitution, undoubtedly can and will vindicate the rights of the District's citizens. We merely reaffirm that if the local courts withhold effective remedy, the federal courts have the power and the duty to provide it.

The judgment of the district court is reversed and the case remanded for consideration on the merits.

*So ordered.*

ROBB, Circuit Judge (dissenting):

The majority concludes that 23 D.C. Code § 110(g) (1973) is merely an exhaustion of remedies requirement and was not intended by Congress to affect the habeas corpus jurisdiction of the federal courts. I am unable to accept this conclusion. Subsection (g) of section 110 provides that "[a]n application for a writ of habeas corpus . . . *shall not be entertained . . . by any Federal . . . court* if it appears that the applicant has failed to make a motion for relief under this section or that the Superior Court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to

---

48. Applying those principles furthers the federal-state analogy behind the Court Reform Act. *See* note 39 *supra* and accompanying text. In fact, not applying the same exhaustion requirements to local District of Columbia prisoners would raise severe equal protection problems. *See* notes 25–31 *supra* and accompanying text. The Government implicitly recognizes this by conceding "there may well be

some question as to whether" Palmore need exhaust further remedies. Gov't. Br. at 31.

49. Appellant urges us to reach the merits of his petition. Appellant's Br. at 48–50. We do not believe the interests of justice require the extraordinary course of de novo consideration of the merits by this en banc court and instead remand the case.

test the legality of his detention." [Emphasis supplied.] Without laboring the point, I think this plain language means exactly what it says.

Since I reject the premise upon which the majority avoids what it considers to be difficult constitutional questions I turn briefly to those questions.

The majority suggests that there may be merit in the argument "that section 110 is not exactly commensurate to habeas corpus both because it is inadequate to protect the interests which mandate ultimate article III review of questions involving constitutional liberty and because it entrusts that task to judges who do not possess the tenure and salary protections which lie at the heart of the independence of the federal judiciary." I note that the relief available in the Superior Court under 23 D.C.Code § 110 (1973) is the equivalent of that available in a federal court under 28 U.S.C. § 2255; and the Supreme Court has held that the scope of 28 U.S.C. § 2255 is "exactly commensurate" with the scope of federal habeas corpus. Sanders v. United States, 373 U.S. 1, 13–14, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Hill v. United States, 368 U.S. 424, 427, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). *See* United States v. Hayman, 342 U.S. 205, 209, 72 S.Ct. 263, 96 L.Ed. 232 (1952). The relief defined in section 110, therefore, is the equivalent of federal habeas corpus relief. Consequently, the basis for the argument that "section 110 is not exactly commensurate to habeas corpus" is reduced to the difference in the tenure and salary protections accorded District Court and Superior Court judges.

I think the argument suggested by the majority is answered in principle by Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). In that case the Supreme Court held that a defendant charged with a felony under the District of Columbia Code may be tried by a judge who does not have tenure and salary protection under Article III of the Constitution; that "under its Art. I, § 8, cl. 17, power to legislate for the District of Columbia, Congress may provide for trying local criminal cases before judges who, in accordance with the District of Columbia Code, are not accorded life tenure and protection against reduction in salary." 411 U.S. at 390, 93 S.Ct. at 1672. If without the dilution of his constitutional rights a man may be tried and sentenced to the penitentiary by an Article I judge of the Superior Court, I see no reason why he may not be limited to that same court when applying for collateral post-conviction relief. A prisoner's constitutional rights are no more diluted and he is no more disadvantaged in the one case than in the other. In both cases review may be had in the United States Supreme Court. The Article I courts held competent to administer the District of Columbia's criminal justice system exclusive of Article III courts are perforce competent to dispense collateral post-conviction relief exclusive of the habeas corpus jurisdiction of Article III courts.

The majority also suggests that section 110(g), as construed by the government, may deny a prisoner convicted in the District of Columbia court equal protection of the law by prohibiting collateral review in an Article III court, a remedy available to all prisoners convicted in state courts. Once more I think Palmore v. United States, 411 U.S. at 410, 93 S.Ct. 1670, answers the argument. As the *Palmore* decision establishes, there is no invidious discrimination when a person in the District of Columbia is tried in an Article I court for a violation of an act of Congress, applicable only within the District, although elsewhere in the United States he would be tried in an Article III court for any violation of a general federal statute. I think it follows that it is not a denial of equal protection when that person is required to present his application for collateral relief to an Article I District of Columbia court. Again, equal protection is denied no more in the one case than in the other. United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), cert. denied, 405 U.S. 998, 92

S.Ct. 1251, 31 L.Ed.2d 467 (1972), relied upon by the appellant, does not require a contrary conclusion. In that case, as the majority here notes, the standards for release on bail under the District of Columbia statute were harsher than those of the Federal Bail Reform Act. In the case before us however the District of Columbia courts will be governed by the same standards applicable in federal Article III courts; and any improper deviation from such standards will be subject to correction by the Supreme Court of the United States.

I dissent.